UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| FARAH NAZ,<br><br>_Plaintiff,_<br><br>v.<br><br>JENNIFER M. GRANHOLM,<br>Secretary of Energy,<br><br>_Defendant._ | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)    Civil Action No. 22-1730 (DLF) |

**MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT
AND MEMORANDUM IN SUPPORT THEREOF**

Plaintiff, Farah Naz ("Plaintiff") brings this lawsuit against Defendant, Jennifer M. Granholm, in her official capacity as the Secretary of Energy ("Defendant"), claiming that her former employer, the Department of Energy ("Department" or "Agency"), engaged in unlawful employment discrimination and retaliation against her in violation of Title VII, 42 U.S.C. § 2000e et seq., and seeks judicial review of a Merit Systems Protection Board ("MSPB") Administrative Judge's decision ("MSPB Decision") (enclosed herewith as Exhibit 1 ("Ex. 1")) affirming Defendant's removal of Plaintiff for unacceptable performance and rejecting her affirmative defenses—discrimination and retaliation for engaging in protected EEO activities—which feature most prominently in Plaintiff's complaint.[1] Plaintiff appears to press three types of claims (for which she has checked the corresponding boxes on her complaint form):  discrimination (on five

---

[1]    Plaintiff's "Complaint for Employment Discrimination" (ECF No. 1) makes no explicit reference to 5 U.S.C. § 4303 (permitting an agency to reduce in grade or remove an employee for unacceptable performance).  Nonetheless, Defendant addresses both components of the MSPB's "mixed case" appeal.

different bases:  race, gender, religion, ethnicity, and national origin), failure to promote, and retaliation/reprisal.

Defendant respectfully requests that the Court dismiss Plaintiff's Complaint (collectively ECF Nos. 1, 1-1)[2] under Federal Rule of Civil Procedure ("Rule") 12(b)(6) because it fails to state any plausible claim for relief under Title VII.  That is, Plaintiff fails to plead facts sufficient to give rise to a plausible inference of discrimination as to any materially adverse employment action. Plaintiff similarly fails to plead facts to support a plausible entitlement to relief as to her retaliation claim as there is no evidence to support a causal link between her removal and any statutorily protected activity.  *First*, Plaintiff pled insufficient facts giving rise to a plausible inference of discrimination as to any of the five bases asserted: race, gender, religion, ethnicity, or national origin.  *Second*, although Plaintiff checks the "failure to promote" box on her form complaint, she pled no facts about such alleged failure.  *Third*, as to the retaliation claim, Plaintiff has not pled crucial facts to render her claim plausible.  She has not pled when she participated in protected activity or what that activity consisted of (much less asserted that her supervisors knew about her protected activity).

Alternatively, the Court should grant summary judgment in Defendant's favor because, *first*, Plaintiff cannot establish that the MSPB Administrative Judge's finding that she was properly removed for unacceptable performance was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; and *second*, Defendant had legitimate nondiscriminatory

---

[2]     In addition to the facts stated in the form complaint (ECF No. 1), Plaintiff attaches "Exhibit 'A' and 'B'" to Part III, Section C. Defendant's references to Plaintiff's numbered paragraphs in this Memorandum are derived from "Exhibit 'B,'" attached to Plaintiff's Complaint, unless otherwise stated. ECF No. 1, § III(E) at 6; ECF. No. 1-1 at 3-9.

reasons for Plaintiff's removal, which is supported by substantial evidence in the record, and

Plaintiff cannot and did not establish those reasons were mere pretext.

## FACTUAL BACKGROUND[3]

### I.    Plaintiff's Employment with the Department and Her Allegations of Discrimination and Retaliation

Plaintiff is a former employee who served as an Industrial Economist, GS-12, for the

Department's Office of Energy Consumption and Efficiency Analysis (the "Office"), U.S. Energy

Information Administration (the "Administration") in Washington, D.C., from January 8, 2017,

until her removal effected on January 29, 2021. Compl. ¶¶ 1-2, 81. Plaintiff was a member of the

Industrial Team, which provided "long-term projections of energy consumption in the industrial

sector for the Administration's two annual flagship publications" and "publishable analytical work

on industrial energy consumption trends using both [the Administration] and externally-sourced

data." *Id.* ¶¶ 18, 61; MSPB Decision (Ex. 1) at 2.

Plaintiff began her tenure at the Department under the supervision, until June 8, 2019, of

Kelly Perl, Supervisory Industry Economist, whereafter Peter Gross, Supervisory Operations

Research Analyst, replaced Perl and became Plaintiff's supervisor until her removal from the

Agency. Exhibit 1 at 2. James Turnure, Director of the Industrial Section for Transportation,

Building, and Industrial Sections, was Plaintiff's second-line supervisor and performance

reviewing official. *Id.* Turnure also exercised supervisory duties during the transition from Perl to

---

[3]    The factual allegations stated herein are drawn from the Complaint and are accepted as true solely for purposes of this Motion. *See Hettinga v. United States*, 677 F.3d 471, 476 (D.C. Cir. 2012).  In addition to the facts asserted herein, Defendant is contemporaneously filing with this Memorandum a Statement of Material Undisputed Facts ("SUMF") in support of its alternative motion for summary judgment.

Gross as it related to performance element issues from prior reviews. Compl. ¶¶ 14, 60, 61; Exhibit 1 at 2.

Plaintiff alleges that she testified on October 12, 2017, in favor of a colleague in an Equal Employment Opportunity ("EEO") investigation involving Perl, and Plaintiff believes the employment actions she experienced are based on retaliation therefor. Compl. ¶ 4. Plaintiff also alleges that these employment actions are due to discriminatory animus, including her "wrongful" termination, based on race (Middle Eastern), gender/sex (Female), religion (Islam), and national origin (Pakistani). Compl. Part III, § D, at 5. The Complaint mentions certain allegedly adverse employment actions—including multiple denials for training or leadership opportunities, denials of promotions, transfers, and the suspension of alternative work schedules and telework—but it does not allege additional facts regarding these actions, including Departmental policies that limit certain privileges and opportunities for employees whose performance falls below standards. *See* Compl. ¶¶ 23-24, 34, 40-44, 46, 48, 57.

In the fall of 2017, Plaintiff was issued her performance plan for the performance year 2018, beginning October 1, 2017, and ending September 30, 2018. *See* SUMF ¶ 16.  It included four critical elements:

> (1)    Designing, developing, updating, and utilizing energy analysis tools (models, spreadsheets, databases, etc.);
>
> (2)    Analyzing energy data, programs, and policies;
>
> (3)    Writing articles, reports, and documentation; [and]
>
> (4)    Providing information and analysis findings to internal and external stakeholders.

SUMF ¶ 17.

Perl reviewed Plaintiff's progress on April 5, 2018, and on June 27, 2018. *Id.* at 7, 9. On April 5, 2018, Perl noted that Plaintiff was making progress learning the system but that she was

"not working at her grade level" with respect to Critical Element 1. SUMF ¶ 18. Perl cited two examples of Plaintiff failing to complete assignments: one from the fall of 2017, for which Perl herself had to complete the analysis, and a more recent example involving updating Market Trends where Plaintiff "presented her work in a meeting [but] did not organize the numbers or complete the assignment." *Id.* As to Critical Element 2, Perl noted that Plaintiff was learning more and had a presentation due at the end of May. *Id.* As to Critical Element 3, Perl stated that Plaintiff had a good topic for her 10-page paper due on May 31, 2018, and also had an article due at the end of June. SUMF ¶ 19. Finally, for Critical Element 4, Perl remarked that Plaintiff was still "relatively new to EIA" and that she needed to remember that her supervisor is the most important stakeholder, and to ensure that "all tasks submitted to her supervisor are complete, correct and timely." SUMF ¶ 20.

Perl's June 27, 2018, review of Plaintiff's progress shows greater issues than in the April 5, 2018 review, following Plaintiff's submission of her 10-page paper that had been due on May 31, 2018. *Id.* at 9. Perl noted that Plaintiff "must be able to do uncalibrated runs independently as assigned" with respect to Critical Element 1, adding that Plaintiff continued to "get help" and that "we stand ready to give more help." *Id.* For Critical Element 2, Perl stated that Plaintiff satisfied her presentation requirement. *Id.* For Critical Element 3, Perl stated that Plaintiff submitted her 10-page paper with a solid list of references, but that "most" of the material was not "properly attributed" and "not policy neutral," as required by the Administration's Style Guide. SUMF ¶ 21. Perl remarked that Plaintiff "will need to completely revise this paper, starting with an outline." *Id.* For Critical Element 4, she stated that Plaintiff needed to "assume fewer things and ask more questions" and provided examples, including that Plaintiff should ask, not assume, when

determining if a spreadsheet is wrong and should not assume how to calculate annual growth rates. *Id.*

Plaintiff was given three further opportunities (four in total) to provide her 10-page paper at the Meets Expectations level.  SUMF ¶ 23.  Perl found the first and second re-submissions, on June 22, 2018, and August 24, 2018, respectively, deficient for failure to properly attribute facts to sources.  *Id.*  On September 21, 2018, Perl found that Plaintiff's third re-submission violated the requirement of policy neutrality, and Perl called out grammatical errors, bibliography insufficiencies, and Plaintiff's practice of copying and pasting facts without appropriate attribution.  *Id.* Following her third re-submission, Plaintiff's annual performance rating for Critical Element 3 (*i.e.*, writing articles, reports and documentation) was determined to be at the "Fails to Meet Expectations" level, and consistent with Departmental management written policy (Department Order 331.1C) and Union agreements (Collective Bargaining Agreement ("CBA") § 17.07), Plaintiff was placed on a Performance Improvement Plan ("PIP") on December 3, 2018 because her overall performance was deemed unacceptable. Compl. ¶¶ 31, 37; *see also* 5 C.F.R. § 432.103(b) (defining a critical element as: "a work assignment or responsibility of such importance that unacceptable performance on the element would result in a determination that an employee's overall performance is unacceptable.").

Plaintiff was a member of the National Treasury Employees Union (the "Union"). The Union's CBA with the Department dated January 16, 2013 ("CBA"), permits allegations of discrimination and adverse actions to be raised and provides a forum to pursue such allegations.[4]

---

[4]     Collective Bargaining Agreement, Jan. 16, 2013, available at https://www.energy.gov/hc/ downloads/   collective-bargaining-agreement (last visited Nov. 18, 2022); https://www.energy. gov/sites/default/files/2013/06/f1/Consolidated%20CBA-Appendix%201.pdf (same).

The CBA allows an employee to use only one forum to bring a claim of discrimination or adverse action:

A.    Any aggrieved employee affected by discrimination, a removal, or performance-based reduction in grade, or other adverse action, may, at his/her option, raise the matter under a statutory appeal procedure or under this negotiated grievance procedure, but not both.

B.    Pursuant to 5 U.S.C. 7121, an employee shall be deemed to have exercised her/his option under this provision in adverse actions when the employee files a timely written notice of appeal or files a timely written grievance under this procedure, whichever occurs first.

C.    Pursuant 29 C.F.R. 1614.301, an employee shall be deemed to have exercised his/her option under this provision when the employee files a timely written complaint or files a timely written grievance under this procedure, whichever occurs first[.]

CBA § 11.03.

Plaintiff filed a grievance on December 7, 2018, specifically raising the allegation that the December 3, 2018, PIP was in error and contrary to the provisions in the CBA.[5]  SUMF ¶ 26. On December 14, 2018, Plaintiff filed an EEO Complaint against her supervisors for allegedly subjecting her to discrimination based on her race, color, sex, religion, and national origin, and for retaliation for prior protected EEO activity by putting her on the PIP and for other employment actions she experienced. *See* SUMF ¶ 25; Final Agency Decision ("FAD") in Department Case No. 19-0015-HQ-EI ("First FAD") (Ex. 8) at 2.[6] Plaintiff thereby elected to proceed according to

---

[5]    CBA § 17.02 (defining a PIP to be a "formal memorandum notifying an Employee that his or her performance of at least one critical element is at the Fails to Meet Expectation level, and contains a plan to lead the Employee toward improving performance; the PIP is a mechanism that meets the requirement of 5 CFR Part 432 to provide an Employee with a formal opportunity period to improve performance before a removal or demotion action can be taken based on unacceptable performance").

[6]    The Final Agency Decision from the administrative proceedings related to Plaintiff's claims is cited in the Complaint and is properly incorporated by reference therein. The Court may consider the administrative proceedings identified directly and indirectly in the Complaint as they are both incorporated by reference and are public records. *Banneker Ventures, LLC v. Graham,*

the CBA grievance procedures for allegations involving the issuance of that PIP, and the Court thus lacks jurisdiction over those claims. 29 C.F.R. § 1614.301(a) (explaining that "[a]n aggrieved employee who files a complaint under this part may not thereafter file a grievance on the same matter and vice versa").

Following the resolution of that grievance, the PIP was discontinued, and Plaintiff was given an additional extension, beyond the rating cycle, to submit her 10-page paper and thus improve her final performance rating to at least a "Needs Improvement." SUMF ¶ 27. On January 2, 2019, Plaintiff submitted the fourth and final version of the paper required under Critical Element 3; however, it was still deficient "despite extensive guidance," including several "paste-ins from other sources that were not correctly quoted as block quotes" and "sources" which "could not be confirmed." *Id.* ¶ 39; FY2018 Performance Plan (Ex. 11) at 4. On January 16, 2019, Plaintiff received her 2018 performance evaluation of "Fails to Meet Expectation" for Critical Element 3. SUMF ¶ 28. Plaintiff elected to file a grievance pursuant to the Union's negotiated grievance procedures for the failing rating on February 3, 2019. *Id.* Part III(E) at 6.

A few months later, Plaintiff was issued her performance plan for the performance year 2019, beginning October 1, 2018, and ending September 30, 2019. *See* FY2019 Performance Plan, Apr. 8, 2019 (Ex. 12). It contained the same four Critical Elements. *See* FY2019 Performance Plan (Ex. 12) at 2-5. The remarks for Critical Elements 1, 2, and 4 state that Plaintiff's work was at a satisfactory degree, but that Critical Element 3 is "superseded by a Performance Improvement

---

798 F.3d 1119, 1133 (D.C. Cir. 2015) ("A district court may consider a document that a complaint specifically references without converting the motion into one for summary judgment."); *Kaempe v. Myers*, 367 F.3d 958, 965 (D.C. Cir. 2004) (a court may consider "public records subject to judicial notice on a motion to dismiss").

Plan." Exhibit 12 at 6. On September 18, 2019, Turnure gave Plaintiff a rating of Fails to Meet Expectations for two of four Critical Elements for her 2019 performance evaluation. SUMF ¶ 31.

After the Union's negotiated grievance procedures related to the December 3, 2018, PIP were resolved and Plaintiff's multiple deficient submissions of the 10-page paper, on April 24, 2019, the Department reissued Plaintiff a PIP for Failing to Meet Expectations for Critical Element 3. SUMF ¶ 29; PIP of Apr. 24, 2019 (Ex. 13). The PIP provided Plaintiff with 90 calendar days to improve her performance. SUMF ¶ 30. The PIP documented Plaintiff's Critical Element 3 deficiencies in 2018, stating that during the period between the second (June 28, 2018) and third performance reviews (September 20, 2018), Plaintiff "failed to submit a satisfactory ten-page paper on Irrigation in California as assigned[.]" *Id.* at 2. The PIP went on to list the required actions to improve performance in this Critical Element, including identifying every part of the second draft that relies on an outside source, attributing the sources properly according to the EIA Style Guide, submitting a bibliography with proper citations, a conclusion in her own words, and, by two weeks prior to the end of the 90 days, submission of a final paper that complies with the EIA Style Guides. *Id.* The final paper must be policy neutral, generally free of numeric and grammatical errors, and only contains Plaintiff's work. *Id.* at 3. The PIP also required weekly meetings with Mr. Turnure to discuss Plaintiff's assignments in relation to the performance criteria and to complete and submit a Weekly Progress Report. *Id.* Plaintiff elected to file a grievance pursuant to the Union's negotiated grievance procedures for this PIP. Compl. Part III(E) at 6. On October 11, 2019, Plaintiff filed an EEO complaint citing issues with supervisor Peter Gross, issues with her work assignments, and the asserted limitation of her career advancement opportunities. SUMF ¶ 32

Plaintiff's FY2020 performance plan – containing the same four Critical Elements – was issued on October 1, 2019, ending September 30, 2020.  SUMF ¶ 33.   Following the repeated performance deficiencies and during the 2020 performance period, Plaintiff was issued a Performance Counseling Memorandum dated January 27, 2020, which notified her that her performance in Critical Elements 1, 2, and 3 were deficient. SUMF ¶ 34 The Performance Counseling Memorandum stated that its purpose was to "counsel [Plaintiff] on [her] performance" and that it was not a "Performance Demonstration Period" (also called a "PDP") but her failure to improve to the "Meets Expectation level may result in [] placement on a" Performance Demonstration Period. Performance Counseling Memo. (Ex. 4) at 1. The Performance Counseling Memorandum detailed how Plaintiff's performance was deficient for each Critical Element and provided information about the Employee Assistance Program, which was available to her for assistance. *Id.* at 1-2.

As to Critical Element 1, Plaintiff's performance was deficient because the Fuel Oil & Kerosene assignment was overdue, and the coal/steel regression analysis, which was submitted on January 17, 2020, was turned in over a month late and was done incorrectly. SUMF ¶ 35. Plaintiff's performance in Critical Element 2 was deficient because the preliminary analysis for the Manufacturing Energy Consumption Survey steel industry electrification was overdue and had not yet been submitted.  *Id.*; Ex. 4 at 1-2. Plaintiff's performance in Critical Element 3 was deficient because she did not provide a summary of state-level industrial Combined Heat and Power ("CHP") policies and incentives by the January 17, 2020 due date. *Id.*

Three months later, on April 28, 2020, Plaintiff was placed on a Performance Demonstration Period, whereby she was notified that her performance for the period January 27, 2019, through April 28, 2020, was at the Fails to Meet Expectations Level and that if this did not

improve over the next 30 days, she would receive an overall rating of Fails to Meet Expectations for the annual 2020 performance appraisal period. SUMF ¶ 36. The Performance Demonstration Period Memorandum stated that the purpose was to "inform" Plaintiff of her failing performance in Critical Elements 1, 2, and 3, and to advise her of the "opportunity to improve [her] performance to the Meets Expectations" level. *Id*. at 1.

The Performance Demonstration Period Memorandum provided Plaintiff with four assignments to complete during the period. *Id.* The document went on to list each Critical Element's requirements, Plaintiff's deficiencies in each Critical Element, and the actions required to improve performance to the Meets Expectations level. SUMF ¶ 37. The time frame for completing the Performance Demonstration Period changed due to Plaintiff's absences, and ultimately concluded on July 24, 2020. MSPB Decision (Ex. 1) at 3.

Plaintiff's June 2020 mid-year progress review did not augur well for overall success; she was informed that her performance was likely to result in an overall rating of Fails to Meet Expectations. SUMF ¶ 38. On October 26, 2020, Plaintiff's new supervisor, Peter Gross, cited examples of missing or incomplete work for Critical Element 1, including incomplete assignments and mistakes not being corrected in submitted materials. FY2020 Performance Plan (Ex. 5) at 2; Compl. ¶ 77. For Critical Element 2, the examples included a spreadsheet that was sent one week late with improper formatting and documentation, and assignments not turned in. *Id.* at 3. Critical Element 3 deficiencies included an outline that was not turned in on time, and when it ultimately was, it did not include the required research sources. *Id.* at 4. Further, Gross noted that Plaintiff proposed her own research paper, which was unacceptable and not in her performance plan. *Id.*

On August 13, 2020, two months before Plaintiff's final performance review for 2020, the Agency issued Plaintiff a Notice of Proposed Removal for failure to successfully complete the

Performance Demonstration Period. SUMF ¶ 39.  The Notice of Proposed Removal stated that the action was being proposed based on her "failure to demonstrate the ability to satisfactorily execute the essential duties and responsibilities of [her] position as required in the [Performance Demonstration Period]." SUMF ¶ 40; Notice of Proposed Removal (Ex. 6) at 1. The Notice supplied a detailed explanation of how Plaintiff failed to achieve a Meets Expectations rating on Critical Elements 1, 2, and 3, based on her deficient performance of the Performance Demonstration Period assignments. *Id.* at 3. It stated that Plaintiff missed three of the eight regularly scheduled weekly Performance Demonstration Period meetings and was given an extension from 22 workdays to 30 workdays to complete the Performance Demonstration Period assignments but ultimately "none of the four assignments" Plaintiff attempted to perform met the Meets Expectations level. *Id.*

The Notice stated: "[t]his is a proposal only. No decision will be made until your reply has been received or until after the reply period has passed." SUMF ¶ 41. It provided ten workdays for a response and advised Plaintiff that her reply would be given full consideration before any decision would be made. *Id.* Plaintiff was advised to direct her replies to Lynn Westfall, Director, Office of Energy Markets & Financial Analysis, U.S. Energy Information Administration. *Id.* Plaintiff was afforded multiple opportunities, as well as assistance, to respond to the Notice, which she took advantage of, by responding both orally and in writing, and to obtain Union personnel to represent her in the removal proceedings. Exhibit 1 at 3. Plaintiff elected to file a grievance pursuant to the Union's negotiated grievance procedures for the Notice of Proposed Removal on January 28, 2021. Compl. Part III(E) at 6.

On January 29, 2021, Plaintiff was removed from Federal Service. *Id.* ¶ 81; *See* Removal Decision, Jan. 29, 2021 (Ex. 7). Ms. Westfall stated that she considered Plaintiff's responses and

the record evidence, ultimately finding that Plaintiff's performance was unacceptable and that the "standards and expectations set forth in [FY2020 Performance Plan (Ex. 5), Notice of Proposed Removal (Ex. 6), and the PDP Memorandum (Ex. 3)] were clear," and she accordingly concurred with the Agency's position. SUMF ¶ 43. Westfall also informed Plaintiff that her responses "[did] not provide any legitimate basis to mitigate the proposed action" because they were about "management's alleged improper procedures," "[her] associated past grievances," "leave and vacation time," and "[her] EEO Complaint against [Mr. Gross]." SUMF ¶ 44. In the Removal Decision, Westfall advised Plaintiff of her right to appeal to the MSPB within 30 days from the date of removal. Removal Decision (Ex. 7) at 3. Plaintiff appealed her removal to the MSPB on February 24, 2021. MSPB Decision (Ex. 1) at 1.

## II.    Plaintiff's EEO Complaints

As relevant here, Plaintiff filed at least three EEO Complaints alleging discrimination based on her protected bases and for retaliation for participation in protected activity. Plaintiff filed the first formal EEO complaint on December 14, 2018, a week after filing a grievance with the Union related to the December 3, 2019, PIP. ¶¶ 31, 35, 37. The Department accepted the following issues for investigation:

> Whether Complainant was subjected to discrimination and/or harassment based on race (Asian), color (pale yellow), sex (Female), religion (Islam), national origin (Middle Eastern), and retaliation for prior EEO activity when the following allegedly occurred:
>
> 1. From January 2018, through April 2018, Kelly Perl, Supervisory Industry Economist, Office of Energy Consumption and Efficiency Analysis (OECEA), Energy Information Administration (EIA) who is Complainant's supervisor, interfered with Complainant's efforts to meet with multiple EIA team leads, including John Maples, Supervisory Operations Research Analyst, EIA OECEA; Erik Kreil, Supervisory Economist, EIA Office of Integrated and International Energy Analysis; Lynn Westfall, Director, EIA Office of Energy Markets and

Financial Analysis to explore options for reassignment of Complainant to another team. (Dismissed Issue).[7]

2. On October 11, 2018, and November 3, 2018, Complainant requested that Dr. Perl nominate Complainant for the OEA Innovation Award, but Dr. Perl did not nominate Complainant for the award.

3. In a meeting on November 8, 2018, Dr. Perl "harassed [Complainant] verbally."

4. On November 8, 2018, Dr. Perl informed Complainant that she would not give Complainant a rating of Meets Expectations and that she may place Complainant on a Performance Improvement Plan on Complainant's writing element, which Complainant asserts was based on Dr. Perl's "subjective biases." (Dismissed Issue).[8]

5. On unspecified dates, Dr. Perl held back Complainant's FY'18 performance ratings, and on November 8, 2018, Dr. Perl informed Complainant that she would "extend out [Complainant's] ratings for another 90 days." Complainant further notes that at this time of filing the instant formal complaint, Dr. Perl had not provided Complainant with her FY'18 performance appraisal. (Dismissed Issue).

6. On November 29, 2018, Charles I. Mead, EIA Assistant Administrator, and James Turnure, Director EIA OCECEA, denied Complainant's transfer request even though Mathew Skelton, Industry Economist, EIA OECEA, who is allegedly the only other staff member on Complainant team, has been allowed to work under a different supervisor instead of working under Dr. Perl.

7. Beginning in February 2018 and continuing until the filing of the instant formal complaint, Dr. Perl "bullied" Complainant and denied Complainant career opportunities, including skills training.

8. On December 3, 2018, Dr. Perl placed Complainant on a ninety-day Performance Improvement Plan. (Dismissed Issue).

---

[7]    In the same April 12, 2019 acceptance letter, the Agency dismissed this issue as a discrete incident due to untimely EEO Counselor contact, but considered it under the theory of harassment. 1st FAD (Ex. 8) at 4.

[8]    In its November 29, 2019, Amended Notice of Acceptances, the Department dismissed Issues 4, 5, and 8, regarding not issuing her FY2018 performance evaluation in November 2018, and placing her on a PIP, because on December 7, 2018, she elected to file a grievance regarding the same matters pursuant to Section 11.03(A) of the Union's CBA, prior to filing the First FAD on December 14, 2018, pursuant to 29 C.F.R. §1614.301(a).

9. On March 7, 2019, Dr. Perl raised her voice with Complainant during a face-to-face meeting and "accuse[d] Complainant of "having a concerning behavior" during an email checking class on February 28, 2019. More specifically, Complainant asserts that Dr. Perl stated that Complainant had a frown on her face and sat isolated in the February 28 class and that Complainant gave the instructor a low rating in two areas. Complainant further asserts that as the end of the meeting, Dr. Perl stood over Complainant, ordered Complainant to leave Dr. Perl's office while Dr. Perl pointed towards the door, and told Complainant to "Get OUT."

10. On January 9, 2019, January 31, 2019, February 12, 2019, February 28, 2019, March 7, 2019, March 11. 2019, and through March 15, 2019, Dr. Perl has denied Complainants professional training classes and technical skills development opportunities.

11. On April 24, 2019, Mr. James Turnure, EIA Director of the Office of Energy Consumption and Efficiency Analysis, issued a ninety-day Performance Improvement Plan (PIP) to Complainant. By way of background, Complainant asserted that she requested that Mr. Turnure reschedule the PIP meeting he had scheduled for that afternoon because an NTE representative was not available to attend, but Mr. Turnure disregarded Complainant's request and issued her the PIP via email that afternoon.

12. On May 1, 2019, Mr. Turnure informed Complainant by email that she had forfeited her eligibility to participate in alternative work schedule (AWS) and telework programs as a result of her performance failing to meet expectations for critical element 3 of her performance plan.

13. On June 12, 2019, Mr. Peter Gross, Supervisory Operations Research Analyst, Office of Petroleum Natural Gas and Biofuel, Analysis, Energy Information Administration (EIA), and Complainant's new Industrial Team Lead, informed Complainant during a meeting that she would be the only member of the five-person Industrial Team to report to Mr. Turnure "for a long time."

*See* 1st FAD (Ex. 8) at 2-4.

The Agency issued a final decision on February 11, 2021 and dismissed all of Plaintiff's discrimination claims. 1st FAD (Ex. 8) at 1. Plaintiff appealed the First FAD to the EEOC's Office of Federal Operations on March 11, 2021. On August 8, 2022, the EEOC affirmed the Agency's final decision finding no discrimination. *See* EEOC Decision on 1st FAD, Aug. 8, 2022 (Ex. 14).

Plaintiff filed a second EEO complaint on October 11, 2019. Compl. ¶ 70. On March 5, 2020, the Agency accepted the following issues for investigation:

> Whether Complainant was subjected to discrimination and/or harassment based on race (Middle Eastern/Persian), color (pale yellow), sex (female), religion (Islam), national origin (half Persian/half Indian), and retaliation for prior EEO activity when the following allegedly occurred:
>
> 1. From July 24, 2019 to the date of the instant formal Complaint, Complainant's supervisor, Peter Gross, Supervisory Operations Research Analyst, Energy Information Administration (EIA), constantly criticized Complainant's work, stating that her work is deficient and inaccurate.
>
> 2. From July 24, 2019 to the date of the instant formal Complaint, Mr. Gross has been "spying" on Complainant and micromanaging Complainant's time.
>
> 3. On unspecified dates, Mr. Gross has set unrealistic deadlines for completion of Complainant's assignments, but does not set such deadlines for Complainant's male colleagues. By way of background, Complainant asserts that Mr. Gross maintains a "Boy's Club" with male members of the Industrial Team during official work hours and chats with them for hours about social issues. Complainant further asserts that Mr. Gross assists Complainant's male colleagues with their assignments "like kindergarteners," but Complainant produces her assignments without Mr. Gross' assistance.
>
> 4. From July 24, 2019 to the date of the instant formal Complaint, Complainant repeatedly communicated her concerns to Mr. Gross "about his impulsiveness," but Mr. Gross has become more hostile towards Complainant and bullied Complainant.
>
> 5. From August 2019 to the date of the instant formal Complaint, Mr. Gross "misinform[ed] [Complainant] about [her] projects."
>
> 6. On unspecified dates, Mr. Gross has "deliberately limit[ed] [Complainant's] career development and growth" and has caused Complainant not to qualify for promotions and grade increases.

MSPB Decision (Ex. 1) at 3; *see also* 2d FAD (Ex. 9) at 1; Compl. ¶ 70.  The Agency issued its final decision on April 22, 2021, dismissing all claims of discrimination. 2d FAD (Ex. 9) at 1. Plaintiff appealed the Second FAD 2 to the EEOC on May 19, 2021. *See* ECF No. 1-1 at 17-18. On August 8, 2022, the EEOC affirmed the Agency's final decision finding no discrimination. *See* EEOC Decision on 2d FAD, Aug. 8, 2022 (Ex. 15)

- 16 -

Plaintiff filed a third EEO Complaint on December 7, 2020. On April 26, 2021, the Agency

accepted the following issues for investigation:

Whether Complainant was subjected to discrimination and/or harassment based on Race (Asian American), Sex (female), National Origin (Middle Eastern), Color (Yellow), Religion (unspecified), and/or Reprisal for prior EEO activity when the following allegedly occurred:

1. a. From May 2019 to July 23, 2019, and from October 12, 2019, to the filing date of the instant formal complaint, Complainant's work assignments have been "failed" by supervisor Peter Gross, Supervisory Operations Research Analyst, Office of Long- Term Energy Modeling, Energy Information Administration (EIA).

b. From May 2019 to the filing date of the instant formal complaint, Complainant's work assignments have been "failed" by James Turnure, Director, Office of Energy Consumption and Efficiency Analysis, EIA Office of Long-Term Energy Modeling.

2. From October 12, 2019, the day after Complainant filed a formal EEO complaint in DOE Case No. 19-0114-HQ-EI, to the filing date of the instant formal complaint, Mr. Gross has continued to bully and act in a hostile manner towards Complainant.

3. From December 3, 2019, to the filing date of the instant formal complaint, Mr. Gross and Mr. Turnure placed Complainant on a Performance Improvement Plan (PIP) and a Performance Development Plan (PDP).

4. On October 19, 2020, Mr. Gross "failed" Complainant in her FY 2020 performance rating. By way of background, Complainant alleges this caused her severe stress and that the following morning, on October 20, 2020, she fainted in a public place and suffered injuries as a result of the alleged hostile and stressful meeting.

5. From October 2018 to the filing of the instant formal complaint, Mr. Gross and Mr. Turnure have denied Complainant developmental training.[9]

6. On January 27, 2020, April 23, 2020, April 29, 2020, and July 5, 2020, Mr. Gross issued several disciplinary actions to Complainant.

---

[9]    The Department determined that Plaintiff raised issues regarding denial of training in two prior EEO matters and dismissed those issues from the instant complaint as having been previously decided. 3d FAD (Ex. 10) at 2 n. 1.

*See* FAD in Department Case No. 20-0106-HQ-EI ("Third FAD") (Ex. 10) at 1-2. The Department issued its final decision on January 24, 2022, finding that the record failed to establish by a preponderance of the evidence that Plaintiff was subjected to discrimination and/or harassment based on her protected traits and retaliation for prior EEO activity. *Id*. at 23.

III.    **Procedural Background**

Plaintiff appealed her removal to the MSPB on February 24, 2021.   SUMF ¶ 4. On September 3, 2021, the MSPB issued its decision affirming the Agency's removal action. *See generally id.* The Administrative Judge found that the Agency had proven by substantial evidence that it had established valid performance standards for Plaintiff's position, that they had been communicated to her, and that Plaintiff had reasonable opportunities to improve. SUMF ¶ 6.   As to her affirmative defenses to her removal, which are identical to the claims in the instant case (discrimination due to her protected bases and retaliation for protected activity), the Administrative Judge determined that Plaintiff failed to establish her claim of discrimination or retaliation by a preponderance of the evidence.  SUMF ¶ 7.

Plaintiff petitioned the EEOC to review the MSPB final decision as to the employment discrimination and retaliation claims, and the EEOC concurred with the Administrative Judge's decision.[10]  *See* SUMF ¶¶ 8-9; EEOC Decision, May 23, 2022 (Ex. 2) at 1; ECF No. 1-1 at 10-14. The EEOC agreed with the MSPB Administrative Judge's ultimate finding that Plaintiff did not

---

[10]    *See* 5 U.S.C § 7702(b)(3) (stating that once the Commission makes a determination to consider the decision, it shall, within 60 days after the date of the determination, consider the entire record of the proceedings of the Board and, on the basis of the evidentiary record, either (A) concur; or (B) issue in writing another decision which differs from the decision of the MSPB to the extent that the Commission finds that, as a matter of law, either: (i) the decision of the Board constitutes an incorrect interpretation of any provision of any law, rule, regulation, or policy directive; or (ii) the decision involving such provision is not supported by the evidence in the record as a whole).

establish that she was removed as a reprisal for protected activity or due to discrimination because of her protected bases. EEOC Decision (Ex. 2) at 3-4; ECF No. 1-1 at 3-4. *See also* SUMF ¶ 10

Once the EEOC issued its decision, the MSPB decision became judicially reviewable, 5 U.S.C. § 7702(b)(5)(A), and Plaintiff had the right to bring all her causes of action to the district court, which she did by filing the instant action. *Id.* § 7702(e)(3). On June 16, 2022, Plaintiff filed the instant complaint alleging that she was "[w]rongfully terminated"; discriminated against based on her race (Middle Eastern), gender/sex (Female), religion (Islam), and national origin (Pakistani); denied promotion; "retaliat[ed] [against her for filing] EEO complaints and as a witness to an EEO case." SUMF ¶ 11.

**STANDARD OF REVIEW**

I.   **Rule 12(b)(6)**

A motion to dismiss under Rule 12(b)(6) tests whether the complaint properly "state[s] a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6).  Although "detailed factual allegations" are not required, a plaintiff must provide "more than an unadorned, the-defendant-unlawfully-harmed-me accusation."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). Rather, the "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* (quoting *Twombly*, 550 U.S.  at 570). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw [a] reasonable inference that the defendant is liable for the misconduct alleged." *Id.*   Allegations that are "merely consistent with a defendant's liability stop short of the line between possibility and plausibility of entitlement to relief." *Id.* (quoting *Twombly*, 550 U.S. at 557) (cleaned up).

In deciding a Rule 12(b)(6) motion, the Court must construe the complaint in favor of the plaintiff, who must be granted the benefit of all inferences that can be reasonably derived from the

facts alleged. *See Hettinga v. United States*, 677 F.3d 471, 476 (D.C. Cir. 2012). However, conclusory allegations are not entitled to an assumption of truth, and even those allegations pleaded with factual support need only be accepted insofar as "they plausibly give rise to an entitlement to relief." *Iqbal*, 556 U.S. at 679. The pleading must demonstrate that the allegations "possess enough heft" to show a plausible entitlement to relief and be able to "nudge" the claims "across the line from conceivable to plausible." *Iqbal*, 556 U.S. at 680; *Twombly*, 550 U.S. at 555, 557. "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555). "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Id.* (quoting *Twombly*, 550 U.S. at 557) (alterations in original).

In deciding a motion under Rule 12(b)(6), a court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits or incorporated by reference, and matters about which the court may take judicial notice. *Grant v. Dep't of Treasury,* 194 F. Supp. 3d 25, 29 (D.D.C 2016). In addition, the Court may take judicial notice of public records, such as a plaintiff's formal EEO complaint, an administrative judge's decision and a final agency decision. *See, e.g., id.* at 28 n.2 ("[T]he Administrative Judge's Initial Decision, Treasury's Final Agency Decision, and MSPB's Final Order are official, public documents subject to judicial notice."); *Laughlin v. Holder*, 923 F. Supp. 2d 204, 209 (D.D.C. 2013) (recognizing that a court may consider plaintiff's formal administrative complaint and the administrative judge's order, without converting defendant's motion to dismiss into one for summary judgment, where, among other things, these documents "are integral to [plaintiff's] exhaustion of administrative remedies, and are public records subject to judicial notice"). The Court may also consider "'documents upon which the plaintiff's complaint necessarily relies even if the document is produced not by the

plaintiff in the complaint but by the defendant in a motion to dismiss[.]'" *Page v. Mancuso*, 999 F. Supp. 2d 269, 275 (D.D.C. 2013). "For example, a plaintiff's complaint 'necessarily relies' on a document when the complaint 'quote[s] from and discuss[es a document] extensively.'" *Id.*

Furthermore, "the Court may consider documents specifically referenced in the complaint where the authenticity of the document is not questioned." *United Mine Workers of Am., Int'l Union v. Dye*, Civ. A. No. 06-1053(JDB), 2006 WL 2460717, at *6 (D.D.C. Aug. 23, 2006); *see also Williams v. Chu*, 641 F. Supp. 2d 31, 34 (D.D.C. 2009) ("[i]n determining whether a complaint fails to state a claim" under Rule 12(b)(6), the trial court may consider not only "the facts alleged in the complaint," but also "any documents either attached to or incorporated [by reference] in the complaint and matters [subject to] judicial notice").

## II.   **Rule 56**

A court may grant summary judgment when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A "material" fact is one capable of affecting the substantive outcome of the litigation. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "By its very terms, the [summary judgment] standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Id.* at 247-48 (emphases in original); *see Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999) (conclusory assertions offered without any evidentiary support do not establish a genuine issue for trial). "A dispute about a material fact is not 'genuine' unless 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Ward v. McDonald*, 762 F.3d 24, 31 (D.C. Cir. 2014) (quoting *Mogenhan v. Napolitano*, 613 F.3d 1162, 1165 (D.C. Cir. 2010)).

Mere speculation is insufficient to defeat summary judgment. *Morris v. McCarthy*, 825 F.3d 658, 674 (D.C. Cir. 2016). "Even in employment discrimination cases where elusive concepts such as motive or intent are at issue, [the Rule 56] standard compels summary judgment if the non-moving party rests merely upon conclusory allegations, improbable inferences and unsupported speculation." *Spiegel v. Leavitt*, Civ. A. No. 01-2195, 2005 WL 2402322, at *8 (D.D.C. Sept. 22, 2005).

III.    **This Court's Review of the MSPB's Decision**

"In mixed cases that present both adverse personnel actions and discrimination claims, courts treat the claims as a single unit, but apply different standards of review." *Akosile v. Armed Forces Ret. Home*, 141 F. Supp. 3d 75, 88 (D.D.C. 2015) (internal quotation marks omitted). "When considering non-discrimination claims on appeal from the MSPB's determination, 'the district court may set aside the administrative adjudication only if it is arbitrary or capricious, obtained without compliance with lawful procedures, unsupported by substantial evidence or otherwise not in accordance with law.'" *Furey v. Mnuchin*, 334 F. Supp. 3d 148, 171 (D.D.C. 2018) (quoting *Barnes v. Small*, 840 F.2d 972, 979 (D.C. Cir. 1988)); *see also* 5 U.S.C. § 7703(c). In short, to be affirmed, the decision need only be shown to have a "rational basis in the law." *Furey*, 334 F. Supp. 3d at 171 (quoting *Hanna v. Herman*, 121 F. Supp. 2d 113, 121 (D.D.C. 2000)).  Ultimately, the district court's role in this area is limited, and it reviews the Board's decision deferentially.  *See*, *e.g.*, *Fogg v. Ashcroft*, 254 F.3d 103, 112 (D.C. Cir. 2001).

**ARGUMENT**

I.    **The Complaint Fails to State Any Plausible Claim for Relief Under Title VII.**

A.    **Discrimination**

Plaintiff alleges that her "removal from service [was] the product of unlawful discrimination on the basis of race (Asian), religion (Islam), and national origin (Middle Eastern)."

Compl. Ex. A ¶ 9.  Elsewhere, she includes her gender as a basis for the discrimination against

her.  SUMF ¶ 11 .[11] The only date Plaintiff cited in the Complaint for the discriminatory acts is

the date she was terminated.  *See* Compl. Part III(B) at 5. Nowhere in the Complaint are Plaintiff's

personal characteristics further referenced.  That means, by definition, that nowhere is any direct

and plausible causal connection shown between those characteristics and any adverse action.  As

such, there is nothing other than conclusory allegations to support a causal inference that race,

gender, religion or national origin was the Agency's motivating factor.  *See*, *e.g.*, *Slate v. Public*

*Defense Serv.*, 31 F. Supp. 3d 277, 298 (D.D.C. 2014).  "Threadbare recitals of the elements of a

cause of action, support by mere conclusory statements, do not suffice" at the pleading stage and

cannot sustain Plaintiff's discrimination claim.  *Iqbal*, 556 U.S. at 678.

Plaintiff does not allege in the Complaint that Defendant took any of these employment

actions because of her race, gender, religion or national origin, besides on the complaint form and

the reiteration of the same statement in Exhibit A. *See* Compl. Part III(A) at 5. Only once in the

Complaint does Plaintiff even come close to tying an employment action to one of her protected

bases, but that allegation, too, was conclusory:  she allegedly told her second-level supervisor that

she felt he had taken her Alternate Work Schedule away because of her status as a minority woman.

Compl., Exhibit B at ¶ 59.  But that is pure speculation and wrong.  Loss of the Alternate Work

Schedule perk was not a product of discrimination, but of Department policy and Plaintiff's

union's CBA.  That is, Plaintiff's supervisors had no choice but to terminate Plaintiff's eligibility

to participate, as it was Department policy and a requirement under the CBA to terminate an

employee's Alternate Work Schedule and telework schedule if they failed a critical element on

---

[11]    Complaint Part III(D) curiously lists Plaintiff's race as Middle Eastern and her national

origin as Pakistani, contradicting different characterizations elsewhere.  *See* Compl. Ex. A ¶ 9.

their performance plan. *See* CBA § 25.03(b) (stating that participation in the Alternate Work Schedule program is "predicated on an Employee's performance on any critical element being at or above the equivalent of Meets Expectations, Fully Successful, or Level 3").

Plaintiff's allegations concerning the timeline of events concerning the alleged campaign to discriminate against her renders her discrimination claim implausible. *See Slate*, 31 F. Supp. 3d at 298 (plaintiff's own assertions of retaliation rendered implausible "causal inference that his suspension and/or termination were due to his gender"). Here, Plaintiff asserts that before she "made the fateful decision to aid a colleague in his claims of race discrimination against the" Department, she was "being evaluated on her merits and [on the basis of] the quality of her work." Compl. Ex. A ¶ 4; *id.* ¶ 5 (claiming that after she "spoke out against rampant race discrimination that pervades the Agency, she became the victim of a sustained and pretextual campaign designed to remove her from her position"); *id.* ¶ 6 ("Plaintiff performed her job capably and without critique for the first two years at the Department" until "she agreed to testify against Dr. Kelly Perl," after which a "hitherto unimaginable degree of scrutiny was trained on Plaintiff's every action."); *id.* ("Plaintiff's protected activity neatly divides, on the one hand, the cooperative, respected, and successful career she enjoyed in federal government service and, on the other, the railroading perpetrated by Agency management[.]"). Indeed, Plaintiff leaves no room for the possibility of any other factor having any weight whatsoever, expressly asserting that "the only reasonable explanation for this sea change is that Plaintiff was illegally punished for having participated in protected activity." *Id.* ¶ 8.[12] And at that prior point, when the quality of her work

---

[12]    *See also* Compl. Ex. A ¶ 6 ("management's determination to punish her for having dared to speak out against them"); Compl. Part III(E) ("Management ganged up on me in retaliation to EEO complaints and as witness to an EEO case."); *id.* ("I was transferred to another section on November 8, 2020, but management still terminated me in retaliation and as reprisal for my participation in protected [activity].")

already was being evaluated fairly, Plaintiff possessed all the same personal characteristics that she now says are responsible for her removal: her race, gender, religion, and national origin. Her discrimination claims thus are implausible.

Defendant does not dispute that Plaintiff is a member of a protected class and has suffered an adverse employment action; however, Plaintiff cannot establish that her termination, or any other employment action, gives rise to an inference of discrimination because (i) Defendant has met its burden to provide clear, specific, and credible evidence of its legitimate, nondiscriminatory basis for Plaintiff's removal and (ii) Plaintiff cannot establish, and did not allege sufficient facts to establish, that the Agency's stated reasons were pretext or that the true reason for her removal or any other employment action, was discriminatory animus. Put simply, Plaintiff was removed because, after numerous opportunities to improve, she failed to meet the standards for her position.

At the motion-to-dismiss stage, the guiding lodestar is whether, assuming the truth of the factual allegations taken collectively, the inferences of discrimination drawn by the plaintiff are reasonable and plausibly supported. *See Townsend v. United States*, 236 F. Supp. 3d 280, 298 (D.D.C. 2017); *Nurriddin v. Bolden*, 818 F.3d 751, 756 (D.C. Cir. 2016) (court need not accept plaintiff's inferences if they are unsupported by the facts set out in the complaint). Here the Complaint fails to support the inference that discrimination was the reason for Plaintiff removal or for any other employment action she experienced. The Administrative Judge stated the same: "the sum total of [Plaintiff]'s discussion regarding race, religion and national origin discrimination was to conclude that it occurred." Exhibit 1 at 37. The MSPB Decision further stated that Plaintiff's "bare allegation and conclusory statement [is] insufficient to meet her burden of proof." *Id.* These pleading inadequacies render the discrimination claims in the Complaint insufficient to satisfy the

pleading standard under Rule 8 and, consequently, Plaintiff's Title VII discrimination claims should be dismissed.  *Iqbal*, 556 U.S. at 678.

     **B.**     **Failure to Promote**

     Although Plaintiff checks the "failure to promote" box on her form complaint, this claim – if it was intended to attempt to state a claim – fares no better.  To establish a Title VII prima facie case of discriminatory failure to promote, Plaintiff must show that: (1) she is the member of a minority group; (2) she applied and was qualified for a promotion; (3) despite her qualifications, she was rejected; and (4) other employees of similar qualifications who were not members of the protected group were promoted at the time that her request was denied. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (D.C. Cir. 1973); *Bundy v. Jackson*, 641 F.2d 934, 951 (D.C. Cir. 1981).  For one thing, the Complaint asserts that Plaintiff requested a transfer and got it.  *See* Compl, Exhibit A at ¶ 6.  This fact contravenes a claim that Plaintiff was *persona non grata.* Moreover, simply checking the box is not enough to survive a motion to dismiss. Plaintiff's failure to plead any meaningful facts about any alleged failures to promote are fatal to her claim because it fails to provide the Court with any basis of comparison for determining that she was improperly denied a  promotion in favor of similarly qualified candidates.  *See, e.g., Richard v. Bell Atl. Corp.*, 164 F. Supp. 2d 10, 18-19 (D.D.C. 2001) (relying on nothing more than plaintiff's own conclusory allegations, plaintiff could not demonstrate that she was qualified for the promotion at issue, and therefore she failed to establish prima-facie discrimination); *Iqbal*, 556 U.S. at 678 (although Rule 8 does not require "detailed factual allegations," it does demand "more than an unadorned, the-defendant-unlawfully-harmed-me accusation.").[13]

---

[13]     Even were speculation permitted, the conclusion that discrimination is not a viable claim in this case means that it cannot support a failure to promote claim.  Because retaliation also fails, *see infra*, it, too, cannot support an otherwise conclusory claim.

**C.    Retaliation**

To state a Title VII claim for retaliation, "a plaintiff must first establish a *prima facie* case . . . by showing (1) that [s]he engaged in statutorily protected activity; (2) that [s]he suffered a materially adverse action by [her] employer; and (3) that a causal link connects the two." *Jones v. Bernanke*, 557 F.3d 670, 677 (D.C. Cir. 2009). "If the plaintiff establishes a *prima facie* case, the burden shifts to the employer to produce a legitimate, nondiscriminatory reason for its actions." *Id*. If the employer proffers a non-discriminatory explanation for the conduct at issue, the burden-shifting framework "disappears," and a court "looks to whether a reasonable jury could infer . . . retaliation from all the evidence." *Id*. (internal quotation marks omitted).

Plaintiff alleges management "ganged up[]on [her] in retaliation to EEO complaints and as witness to an EEO case." Compl. Part III(E) at 5; *id.* Ex. B ¶¶ 4, 35, 56, 67, 72. Plaintiff alleges she engaged in protected activity on or about October 12, 2017, by testifying in an EEO investigation and on December 14, 2018, and October 11, 2019, by filing her own EEO Complaints. *See* Compl. Ex. B ¶¶ 4, 35, 70. The only date Plaintiff cited in the Complaint for alleged unlawful acts is the date she was terminated, January 29, 2021. *See* Compl. Part III(B) at 5; Ex. B ¶ 81. However, Plaintiff states, but inadequately alleges, that she experienced other employment actions that were retaliation due to her protected activity, including denial of Advanced Excel training, all Mr. Gross's "negative actions" toward her, denial of medical telework, failure to promote, and creating a hostile work management style. Compl. Part III(A) at 5; *id.* Ex. B ¶¶ 29, 43, 56, 67, 72.

Plaintiff alleges she engaged in two forms of protected activity: (i) she participated as a witness in an EEO investigation on October 12, 2017 (1,205 days before her removal); and (ii) she filed her own EEO complaints on December 14, 2018, and October 11, 2019 (777 days and 476 days, respectively, before her removal). *See* Compl. Ex. B ¶¶ 1, 4, 35, 70, 81.  For either protected

activity, the attenuation between the alleged retaliatory motives and retaliatory acts is far too great to support a plausible inference of causation. *See McIntyre v. Peters*, 460 F. Supp. 2d 125, 133 (D.D.C. 2006); *Rochon v. Gonzales*, 438 F.3d 1211, 1220 (D.C. Cir. 2006) ("we have long held that a 'causal connection . . . may be established by showing the employer had knowledge of the employee's protected activity and the adverse . . . action occurred shortly after that activity").

Based on the Complaint, the employment actions Plaintiff complains of, including her termination, are too remote in time to support a reasonable inference of causation, and Plaintiff alleges no other plausible indicia of retaliation. *See Pueschel v. Chao*, 955 F.3d 163, 167 (D.C. Cir. 2020) (on motion to dismiss, "mere temporal proximity [can] support an inference of causation only where the two events are very close in time" (cleaned up)); *Taylor v. Solis*, 571 F.3d 1313, 1322 (D.C. Cir. 2009) ("an inference of retaliatory motive based upon the 'mere proximity' in time between [a protected activity and an adverse action] two and one-half months later would be untenable on the record here"); *Gustave-Schmidt v. Chao*, 360 F. Supp. 2d 105, 118-19 (D.D.C. 2004) (nearly three-month gap "clearly pushes the temporal requirement in a retaliation case to its outer limit"), *aff'd*, No. 04-5181, 2004 WL 2348142 (D.C. Cir. Oct. 19, 2004).

Here, as the MSPB Administrative Judge found, Peter Gross had knowledge of Plaintiff's prior EEO activity but found "no other basis for finding a connection between the [plaintiff]'s EEO complaints and her removal." Exhibit 1 at 35. Instead, Plaintiff relied on "what she called a hostile work environment to support her contention of retaliation" to show causation. *Id.* Plaintiff cited employment actions such as "micromanagement," "bullying," and "extraordinary amounts of work on unrealistic deadlines" as bases for this claim. Compl. ¶¶ 65, 66, 76. But the Administrative Judge found that Gross was performing the role of a supervisor when addressing an employee who,

like Plaintiff, was not meeting the expectations set in her performance plan and thus classified these acts as attempts to have Plaintiff perform the duties of her position. Exhibit 1 at 36.

Further, Plaintiff offers no evidence that the Agency had any retaliatory motive. The Administrative Judge found that the deciding official, Lynn Westfall, and Plaintiff's supervisor at the time, Peter Gross, had no motive to retaliate based on Plaintiff's prior protected activity. Exhibit 1 at 36. Plaintiff's Complaint references multiple instances of alleged adverse actions by previous supervisors, Perl and Turnure, as evidence of retaliation, but neither of these former supervisors were involved in Plaintiff's removal, as both ceased to be Plaintiff's supervisor years before she was removed in January 2021. *Id*. ¶¶ 47, 60. The MSPB Decision also noted that the first and second act of protected activity Plaintiff engaged in involved Perl, and there is no evidence that Perl was involved in Plaintiff's removal. *Id*.

At the motion to dismiss stage, a plaintiff is not entitled to all conceivable inferences that one may draw from her complaint—only those inferences that are "reasonable." *Iqbal*, 556 U.S. at 678; *see also City of Harper Woods v. Olver*, 589 F.3d 1292, 1298 (D.C. Cir. 2009) (court "need not accept inferences unsupported by facts"). The Complaint fails to allege facts or introduce evidence of an inference for the Court to draw a causal connection or nexus between any of Plaintiff's protected activities and her removal. In sum, the Complaint consist of precisely the sort of "unadorned, the-defendant-unlawfully-harmed-me accusation[s]" that do not suffice to state a plausible claim to relief. *Iqbal*, 556 U.S. at 678 (quotation marks omitted). As such, these claims warrant dismissal for failure to state a plausible claim for relief under Title VII.

### D.    Defendant's Legitimate, Nondiscriminatory Basis for Its Actions

It is well-settled that "[p]oor work performance is a legitimate reason for terminating an employee." *Gonda v. Donahoe*, 79 F. Supp. 3d 284, 295 (D.D.C. 2015) (citing *George v. Leavitt*, 407 F.3d 405, 412 (D.C. Cir. 2005) (noting that "performance below the employer's legitimate

expectations" is one of the two "most common" "legitimate reasons for discharge")); *see Giles v. Transit Emps. Credit Union*, 32 F. Supp. 3d 66, 71 (D.D.C. 2014) ("Defendant has come forward with a legitimate non-discriminatory reason for the employment action that it took: it fired plaintiff based on her job performance."), *aff'd*, 794 F.3d 1 (D.C. Cir. 2015). Plaintiff's job performance deficiencies are well-documented. *See supra* at 4-6; 8-13. Moreover, the record is replete with evidence that Plaintiff was alerted to the deficiencies repeatedly and given *bona fide* opportunities to improve. *See* FY2020 Performance Plan (Ex. 5) (explaining the current performance deficiencies for each Critical Element); Performance Counseling Memo. (Ex. 4) (stating "your failure to improve your performance to the Meets Expectations level may result in your placement on a PDP"); PDP Memo. (Ex. 3) (stating plaintiff's work was not at the Meets Expectations level because it was incorrect, late or not turned in at all and that her performance had continued to decline). Thus, the record amply establishes that Plaintiff was not performing at the Meets Expectations standard for FY2020, including by failing her Performance Demonstration Period, such that her deficient performance was the reason for the decision to remove her, and there is no reasonable support for any other reason for the removal decision.

Specifically, the record shows that on January 27, 2020, Plaintiff was given a Performance Counseling Memorandum by Peter Gross, which stated that her performance was deficient as to Critical Elements 1, 2, and 3, with details for each element. Performance Counseling Memo. (Ex. 4). Gross assigned Plaintiff three assignments related to Critical Element 1 between December 2019 and March 2020. PDP Memo. (Ex. 3) at 1-3.  He expected the first assignment to take no more than three hours.  *Id*. Nonetheless he gave the Plaintiff one full day to complete the assignment and then extended the due date by two business days.  *Id.* at 2. On February 28, 2020, Plaintiff turned in the assignment—***almost one month after*** it was assigned. *Id.* The second

assignment was given on December 10, 2019, and was due on December 13, 2019. *Id.* at 2. Gross expected this assignment to take at most two days to complete, but Gross gave Plaintiff three days to complete it. *Id.* Plaintiff submitted the assignment on January 17, 2020, ***more than a month after*** its due date. *Id.* Not only was Plaintiff's work very late, but it also was wrong. Gross informed Plaintiff that she had regressed the wrong variables and directed her to redo them. *Id.* Plaintiff never followed that instruction, and the assignment was never completed at all. *Id.* The third assignment, the Oil/Natural Gas Production Assignment, was given on December 3, 2019, and was due on January 9, 2020. *Id.* at 3. As of the date of the Performance Demonstration Period Memorandum, April 28, 2020, the assignment had yet to be done. *Id.*

Similarly, Plaintiff was given three assignments related to Critical Element 2 in February and March 2020. *Id.* The first assignment was given on March 18, 2020, and was due March 20, 2020. *Id.* Plaintiff submitted the assignment one week late, on March 27, 2020, with improper documentation and formatting. *Id.* The second assignment was given February 25, 2020, and was due February 26, 2020, while the third assignment was given February 28, 2020, and was due March 2, 2020. *Id.* at 4-5. The second and third assignments were in preparation for a meeting that Gross was to attend on March 12, 2020. *Id.* Plaintiff did not submit the assignments, and Gross's preparation for the meeting was negatively impacted. *Id.* As of the April 28, 2020, issuance of the Performance Demonstration Period Memorandum, Plaintiff had still not turned in any substantive work on these assignments. *Id.*

On January 6, 2020, Plaintiff was also assigned to write a research paper for EIA related to Critical Element 3. *Id.* at 6. Plaintiff had more than three weeks, i.e., until January 31, 2020, to produce an outline. *Id.* On February 11, 2020, Plaintiff made her own proposal for a research paper, which was unacceptable. *Id.* Moreover, due to Plaintiff's deviation from her instructions,

the assignment was not completed as of the date of the Performance Demonstration Period Memorandum. *Id.* As a result of these many demonstrable shortcomings, Gross placed Plaintiff on a Performance Demonstration Period on April 28, 2020. *Id.*

Plaintiff was given four assignments during the Performance Demonstration Period. She "Failed to Meet Expectations" on all four of them. Notice of Proposed Removal (Ex. 6) at 3. Assignment 1 of the Performance Demonstration Period was due on June 8, 2020, which was an extension of a previous assignment the Plaintiff previously submitted on March 31, 2020. PDP Memo. (Ex. 3). Gross met with Plaintiff on June 10, 2020, to review which data to use to complete the assignment. Notice of Proposed Removal (Ex. 6) at 2. He then granted Plaintiff an extension, to June 12, 2020. *Id*. On June 24, 2020, Gross informed Plaintiff that her submission "Failed to Meet Expectations" because she incorrectly calculated the data, which rendered it useless for analysis. *Id.* Assignment 2 of the PDP was due on June 25, 2020, and, on June 24, 2020, Gross met with Plaintiff to address any follow-up questions. *Id.* He gave her an extension of time until June 26, 2020, and had to inform Plaintiff, again, that she "Failed to Meet Expectations" on Assignment 2, because she used incorrect data, improperly labeled data, and had multiple spelling and grammar issues. *Id.*; Removal Decision (Ex. 7) at 2. Assignment 3 was due July 9, 2020. Notice of Proposed Removal (Ex. 6) at 4; Removal Decision (Ex. 7) at 2. On July 8, 2020, Gross met with Plaintiff in an effort to clarify any issues with the assignment. PDP Memo. (Ex. 3) at 9-10; Notice of Proposed Removal (Ex. 6) at 2-4; Removal Decision (Ex. 7) at 2. Again, he was constrained to extend her deadline for the assignment, and once again had to inform Plaintiff that her submission "Failed to Meet Expectations," because it was one week late, riddled with grammatical errors, and failed to conform to the Administration's Writing Style Guide. *Id.* Assignment 4 was due July 22, 2020, but Gross extended the deadline by two more days, to

July 24, 2020, following Plaintiff's broad question on July 17, 2020, about which Gross provided guidance. PDP Memo. (Ex. 3) at 10-11; Notice of Proposed Removal (Ex. 6) at 4; Removal Decision (Ex. 7) at 2-3. However, Plaintiff again "Failed to Meet Expectations" because the assignment was incomplete, relied on incorrect data, mislabeled spreadsheets, and performed incorrect calculations. *Id.* Gross proposed Plaintiff's removal on August 13, 2020, because Plaintiff's performance did not improve during or at the conclusion of the Performance Demonstration Period. *See generally* Notice of Proposed Removal (Ex. 6). Thus, it was Plaintiff's repeated performance issues that prompted the Notice of Proposed Removal and, subsequently, the Removal Decision.

As such, Defendant has supplied ample evidence to show that Plaintiff was removed because she repeatedly displayed unacceptable performance in three Critical Job Elements; that there was a pattern of her work being either incorrect, late, or never completed; and that Plaintiff failed to show any improvement in those areas when given the chance. Furthermore, the MSPB Administrative Judge affirmed the Defendant's decision, and the Commission concurred in the decision and rationale. This pattern of issues shows that any adverse employment action resulted from Plaintiff's deficient performance, and was not because of her race, gender, religion, national origin, or as retaliation for participation in protected activity.

E.     **Plaintiff Cannot Establish Pretext**

Given Plaintiff's considerable pattern of poor performance, no reasonable jury could find that Defendant's legitimate, nondiscriminatory reason for her removal was pretext for discrimination. "Evidence of pretext may include variant treatment of similarly situated employees, discriminatory statements by decision makers, and irregularities in the stated reasons for the adverse employment decision." *Bennett v. Solis*, 729 F. Supp. 2d 54, 60 (D.D.C. 2010). "In addition, a jury can infer discrimination from the combination of . . . any evidence the plaintiff

presents to attack the employer's proffered explanation for its actions' and from 'any further evidence of discrimination that may be available to the plaintiff.'" *Id.* (citation omitted).  Here, the Complaint fails to show that any of reasons exhaustively listed in her Performance Demonstration Period were pretexts for discrimination. She does not point to any direct evidence of discrimination.  Nor does she show that any similarly situated employees were treated more favorably or that there were irregularities in the stated reasons for her removal. Indeed, she does not allege in a non-conclusory fashion that any of the Agency's stated reasons for terminating her were pretext. Because the Complaint's allegations, even if true, do not plausibly show that the Agency's stated reason for Plaintiff's removal are pretext for discrimination and that discrimination on the basis of some protected status was the real reason for the personnel action, Plaintiff's Title VII claims should be dismissed.

## II.    The Court Should Grant the Department Summary Judgment Because Plaintiff's Removal Is Supported By Substantial Evidence

### A.    The MSPB's Decision was not Arbitrary, Capricious, or Contrary to Law, and it was Supported by Substantial Evidence

Plaintiff does not attempt to allege that the MSPB's decision was arbitrary, capricious, or wrong in any way. *See* Compl.  It should be affirmed.  "To show that the MSPB's decision is not arbitrary and capricious, defendant needs only to show that the decision has a 'rational basis in the law.'" *Hanna v. Herman,* 121 F. Supp. 2d 113, 121 (D.D.C. 2000) (quoting *Wilder v. Prokop*, 846 F. 2d 613, 620 (10th Cir. 1998)). "Unacceptable performance" is defined under 5 U.S.C. § 4301(3) as performance "which fails to meet the established standards of one or more critical elements of an employee's position." The Code of Federal Regulations defines a critical element as "a work assignment or responsibility of such importance that unacceptable performance on the element would result in a determination that an employee's overall performance is unacceptable." 5 C.F.R. § 432.103(b).

When addressing unacceptable performance, an agency is required to (i) notify the employee of the critical elements that are unacceptable in performance; (ii) inform the employee of the performance requirements that must be attained for an acceptable rating; (iii) inform the employee that unless her performance in the critical elements improves and is sustained at an acceptable level, the employee may be reduced in grade or removed; (iv) afford the employee a reasonable opportunity to demonstrate acceptable performance in the critical elements in which the employee is unacceptable; and (v) offer the employee assistance in improving the unacceptable performance. 5 C.F.R. § 432.104. Here, the Agency established by substantial evidence that it took each of these steps, and the MSPB Administrative Judge affirmed the removal decision. "[I]n assessing whether the MSPB's ruling was supported by substantial evidence, a court is not supposed to re-weigh conflicting evidence. . . but only set aside the administrative adjudication only if it is arbitrary or capricious, . . . unsupported by substantial evidence or otherwise not in accordance with law." *Robinson v. NTSB*, 28 F.3d 210, 215 (D.C. Cir. 1994) (internal quotation marks and citations omitted); *Barnes*, 840 F.2d at 979.

In this case, the Department has proven by substantial evidence that it took each required step under Section 4303. Even if it did not, there is neither an allegation raised by Plaintiff, nor any evidence to suggest, that the decision of the MSPB was arbitrary, capricious, or an abuse of discretion. *See* Compl. As the EEOC concurred, the MSPB Decision recites the correct legal standards for the applicable burdens of proof, does a thorough job of interpreting the factual evidence, and correctly applies the facts to applicable law. *See* MSPB Decision (Ex. 1) (finding that the agency complied with the requirements of 5 U.S.C. §§ 4301(3), 4302, and 4303(a)); EEOC Decision (Ex. 2) at 3 (finding that, even assuming that Plaintiff established a *prima facie* case of

discrimination based on reprisal for protected EEO activity or any additional basis, the Department

provided legitimate, nondiscriminatory reasons for Plaintiff's removal).

> **B.     Plaintiff Received Notice of the Critical Job Elements of Her Position, the Inadequacies of her Performance, Was Afforded a Reasonable Opportunity to Demonstrate Acceptable Performance, and Was Notified that Continued Poor Performance Could Result in Removal**

The MSPB Administrative Judge found that the Agency communicated to Plaintiff the

standards and critical elements of her job; notified Plaintiff of the inadequacies of her performance;

and gave her adequate opportunities to improve—all determinations that were found not contrary

to law or unsupported by substantial evidence in the record. MSPB Decision (Ex. 1) at 7, 30. The

record is replete with evidence that Plaintiff was apprised of her performance issues. *See supra* at

Section I.D. *See also* MSPB Decision (Ex. 1) at 8-15 (Critical Element 1); 15-23 (Critical Element

2); 23-29 (Critical Element 3); 30-31 (Plaintiff was notified of performance issues, given ample

opportunities to improve, offered regular performance meetings, and given detailed instructions).

The Administrative Judge further noted that any doubt about the standards she was measured

against was fleshed out in Plaintiff's Performance Demonstration Period, which provided very

clear directions for the successful completion of that period. MSPB Decision (Ex. 1) at 6; PDP

Memo. (Ex. 3). It is also undisputed that the Agency provided Plaintiff with notice of the

performance standards and critical elements of her position at least four times before placing her

on a Performance Demonstration Period. *See supra* at 4-6, 8-10. *See also* SUMF ¶¶ 16-24, 31, 33.

Plaintiff was informed as early April 5, 2018, at a mid-year progress review, that she was

not performing at her grade level and that two assignments had not been completed. *See* FY2018

Performance Plan (Ex. 11). Plaintiff was alerted to her performance rating of Fails to Meet

Expectations on January 16, 2019. Compl. ¶ 39. A year later, on January 27, 2020, Plaintiff was

issued a Performance Counseling Memorandum in which Gross informed her, again, that her

performance was deficient as to Critical Elements 1, 2, and 3, and detailed how her performance was deficient as to each of those critical elements. Performance Counseling Memo. (Ex. 4) at 81.

The MSPB Administrative Judge found that the Agency's provision of a 30-day PDP period "afford[ed] [Plaintiff] a reasonable opportunity to demonstrate acceptable performance, commensurate with the duties and responsibilities of the position," as required by 5 C.F.R. § 432.104. *See generally* MSPB Decision (Ex. 1). Thus, after providing Plaintiff with ample opportunity to improve—indeed, over two years of opportunities—the Agency properly removed Plaintiff on January 29, 2021 because her performance remained at the Fails to Meet Expectations level for Critical Elements 1, 2, and 3. *See supra* at 12-13.

Accordingly, Defendant sufficiently communicated the standards and critical elements of the job to Plaintiff, notified her of her inadequacies, gave her an opportunity to improve, and notified her multiple times that continued poor performance could result in her removal from Federal Service.

### C.    Plaintiff was Provided with Assistance to Improve Her Unacceptable Performance

The MSPB Administrative Judge found substantial record evidence that the Department tried to provide Plaintiff with adequate assistance before and during the Performance Demonstration Period. *See* MSPB Decision (Ex. 1) at 30. Efforts the Agency undertook to ensure that Plaintiff had a reasonable opportunity to demonstrate acceptable performance included hour-long weekly Performance Demonstration Period meetings for Plaintiff to obtain clarifications on any assignments. Notice of Proposed Removal (Ex. 6) at 2. For example, Plaintiff's first-line supervisor, Peter Gross, met weekly with her during the Performance Demonstration Period, during which they discussed assignments and any issues Plaintiff was having, along with very specific instructions about how to complete each assignment, such as how many sentences to devote to describing the recycling processes and which issues to focus on. MSPB Decision (Ex. 1)

at 26. On more than one occasion, the Agency also granted Plaintiff additional time to complete Performance Demonstration Period assignments. Notice of Proposed Removal (Ex. 6) at 3.

Despite these opportunities, Plaintiff continued to submit assignments that were incomplete, incorrect, and late. *See id.* Before the Performance Demonstration Period, Defendant attempted to counsel Plaintiff with a Performance Counseling Memorandum, which detailed how Plaintiff's performance was deficient for each Critical Element and provided information about the Employee Assistance Program that was available to her for assistance. Performance Counseling Memo. (Ex. 4) at 1-2.

As the MSPB Administrative Judge appropriately found, the Agency provided Plaintiff with the assistance necessary for her to successfully complete the PDP and thus improve her performance, but Plaintiff continued performing below the expected level of performance. *See* Compl. In the MSPB Decision, the Administrative Judge exhaustively set forth the legal criteria governing removals for unacceptable performance, and concluded that Defendant complied and proved this with substantial evidence in the record. MSPB Decision (Ex. 1) at 4-31.

D.    **The Department Complied with the Requirements for Properly Removing Plaintiff from Employment**

Federal agencies are given the authority pursuant to 5 U.S.C. § 4303(a) to remove an employee for unacceptable performance. When an agency proposes an employee's removal, it must (i) provide the employee with 30 days advance written notice of the proposed action, and the notice must identify "specific instances of unacceptable performance by the employee" and "the critical elements of the employee's position involved in each instance of unacceptable performance"; (ii) notify the employee of his right to "be represented by an attorney or other representative"; (iii) allow the employee a reasonable time to respond to the charges orally and in writing; and (iv) provide a written decision that "specifies the instances of unacceptable

performance upon which the . . . removal is based" and has the concurrence of "an employee who is in a higher position than the employee who proposed the [removal]." 5 U.S.C. § 4303(b)(1); *see United States v. Fausto*, 484 U.S. 439, 446 (1988).

It cannot be reasonably disputed that the Department complied with these statutory requirements when proposing and effecting the removal of Plaintiff from employment. First, within the August 13, 2020, Notice of Proposed Removal, Plaintiff was informed that no decision would be made for at least 30 days, that she had the right to have a representative in the removal proceedings, and that she could respond in writing and/or orally. Notice of Proposed Removal (Ex. 6). It also cannot be disputed that Plaintiff was offered an adequate opportunity, as well as assistance, to respond to the Notice. *See* Removal Decision (Ex. 7) (stating Plaintiff responded both orally and in writing and obtained union representation); MSPB Decision (Ex. 1) at 3. Finally, Lynn Westfall, the Director of EIA and the decisionmaker, issued a written decision articulating specific instances of unacceptable performance that did not meet expectations by Plaintiff and found that the "standards and expectations set forth in [the various performance documents] were clear," and she thus concurred with the Agency's proposal. Removal Decision (Ex. 7) at 1.

In sum, this Court should affirm the MSPB Administrative Judge's decision on Plaintiff's discrimination claim because the Agency's decision, shown through the exhibits and the record discussed above and in Defendant's SUMF, is supported by substantial evidence, and was done in strict adherence to the procedures required by statute and regulations. 5 U.S.C. § 7703(c).

Further, there is no allegation raised by Plaintiff, nor is there any basis to conclude, that the MSPB decision was arbitrary, capricious, or an abuse of discretion. *See* Compl. In the MSPB decision, the Administrative Judge exhaustively set forth the legal criteria governing removals for unacceptable performance. MSPB Decision (Ex. 1) at 4-31. Plaintiff's Complaint contains no

references to a regulation or statute, nor does it offer record-based details that demonstrate legal error by the MSPB Administrative Judge. *See generally* Compl. Additionally, the EEOC concurred with the MSPB's findings, further reenforcing the conclusion that any affirmative defenses to removal raised by Plaintiff did not meet the requisite standard of proof. EEOC Decision (Ex. 2) at 4. Summary judgment affirming Plaintiff's removal for unacceptable performance is thus proper.

## CONCLUSION

For the foregoing reasons, Defendant respectfully requests that the Complaint be dismissed pursuant to Rule 12(b)(6) under Title VII, or, alternatively, grant summary judgment in Defendant's favor because Defendant removed Plaintiff from her employment for the legitimate, nondiscriminatory reason that she displayed unacceptable performance on multiple critical job elements.

Dated: December 5, 2022

Respectfully submitted,

MATTHEW M. GRAVES, D.C. Bar # 481052
United States Attorney

BRIAN P. HUDAK
Chief, Civil Division

By: _____/s/_____
JOHN MOUSTAKAS, D.C. Bar #442076
Assistant United States Attorney
601 D Street, N.W.
Washington, D.C. 20530
Telephone: 202-252-2518

*Attorneys for the United States of America*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify under penalty of perjury that on November 5, 2022, I caused to be served

on Plaintiff via first-class mail, postage prepaid, the foregoing Motion to the following address:

**FARAH NAZ**
13414 Ansel Terrace
Germantown, MD 20874


/s/_____
JOHN MOUSTAKAS
Assistant United States Attorney

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| FARAH NAZ, | ) |
| | ) |
| *Plaintiff,* | ) |
| | ) |
| v. | ) |
| | ) |
| JENNIFER M. GRANHOLM, | ) |
| Secretary of Energy, | ) |
| | ) |
| *Defendant.* | ) |
| | ) |

Civil Action No. 22-1730-DLF

**[PROPOSED] ORDER**

UPON CONSIDERATION of the Defendant's Motion to Dismiss or, in the alternative for Summary Judgment, any opposition or reply thereto, and the entire record herein, it is hereby ORDERED that Plaintiff's Complaint is dismissed with prejudice.

SO ORDERED.


Dated: _____          _____

Hon. Dabney L. Friedrich

Dated: Month Day, Year
        Washington, DC

Respectfully submitted,

MATTHEW M. GRAVES, D.C. Bar #481052
United States Attorney

BRIAN P. HUDAK
Chief, Civil Division


By: _____/s/_____
        <INSERT NAME>
        Assistant United States Attorney
        601 D Street, NW
        Washington, DC 20530
        <INSERT PHONE>

*Attorneys for the United States of America*

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| FARAH NAZ, | ) |
| | ) |
| *Plaintiff,* | ) |
| | ) |
| v. | ) |
| | ) |
| JENNIFER M. GRANHOLM, | ) |
| Secretary of Energy, | ) |
| | ) |
| *Defendant.* | ) |
| | ) |

Civil Action No. 22-1730-DLF

## **<u>DEFENDANT'S STATEMENT OF UNDISPUTED MATERIAL FACTS</u>**

Pursuant to Local Civil Rule 7(h), Defendant Jennifer Granholm, Secretary of Energy, (hereafter "Defendant" "Department" or "Agency") hereby submits this Statement of Material Facts as to which there is no genuine dispute in support of her motion to dismiss or in the alternative for summary judgment, in response to Plaintiff's Complaint in this action.

1.    Plaintiff is a former employee who served as an Industrial Economist, GS-12, for Defendant's Office of Energy Consumption and Efficiency Analysis ("OECEA"), U.S. Energy Information Administration ("EIA") in Washington, D.C. from January 8, 2017 until January 29, 2021. Compl. Ex. B ¶¶ 1, 81.

2.    On January 29, 2021, Plaintiff was removed from Federal Service for unacceptable performance pursuant to 5 U.S.C. § 4303(a). *Id*. ¶ 81; *see* Exhibit 7, Removal Decision, Jan. 29, 2021.

3.    Plaintiff's "Complaint for Employment Discrimination" makes no explicit reference to 5 U.S.C. § 4303. *See* Compl. ECF No. 1.

4.      Plaintiff appealed her removal to the Merit Systems Protection Board ("MSPB") on February 24, 2021 and the MSPB Administrative Judge issued a decision affirming the Department's removal of Plaintiff on September 3, 2021. *See* Exhibit 1, MSPB Decision, Sept. 3, 2021.

5.      Plaintiff alleged in her affirmative defenses that her removal was based on unlawful employment discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964, as amended, ("Title VII") 42 U.S.C. § 2000e et seq. *Id.*

6.      The MSPB Administrative Judge found that the Agency had proven by substantial evidence that it had established performance standards for Plaintiff's position, that they had been communicated to her, and Plaintiff had reasonable opportunities to improve, but continued performing below the expected level of performance. *Id.*

7.      The MSPB Administrative Judge found Plaintiff failed to establish her affirmative defenses by a preponderance of the evidence and dismissed them, which claims and allegations are identical to the Complaint in the instant case. *Id.* at 37-38.

8.      Plaintiff appealed the Administrative Judge's decision affirming her removal by petitioning the U.S. Equal Employment Opportunity Commission's ("EEOC" or "Commission") to consider the MSPB's final decision with regard to her affirmative defenses, the Title VII employment discrimination and retaliation claims pursuant to 5 U.S.C. § 7702(b)(1). ECF No. 1-1 at 10-14, 17.

9.      On May 23, 2022, the Commission concurred with the Administrative Judge's decision and upheld Plaintiff's removal and denial of her affirmative defenses. *See* Exhibit 2, EEOC Decision, May 23, 2022; ECF No. 1-1 at 10-14.

10.     The Commission agreed with the Administrative Judge's finding that Plaintiff failed to establish her removal was based on reprisal for protected activity and discrimination because of

her protected bases, and the Agency provided legitimate, nondiscriminatory reasons for Plaintiff's removal. Ex. 2 at 3-4; ECF No. 1-1 at 3-4.

11.    Pursuant to 5 U.S.C. § 7702(b)(5)(A), Plaintiff filed the instant Complaint on June 16, 2022, alleging she was "[w]rongfully terminated"; discriminated against based on her race (Middle Eastern), gender/sex (Female), religion (Islam), and national origin (Pakistani); failed to [be] promote[d]; "retaliat[ed] [against for filing] EEO complaints and as a witness to an EEO case." Compl. Part III, Section D, E, at 5.

12.    Plaintiff's Complaint does not contain an allegation that the MSPB Decision is arbitrary, capricious, an abuse of discretion, not in accordance with law, or otherwise wrong in any way. *See* Compl. ECF No. 1.

13.    Plaintiff's Complaint does not contain an allegation that the Agency's legitimate, nondiscriminatory reasons for her removal were pretextual. *Id.*

14.    Plaintiff's supervisors during her tenure with Defendant were Kelly Perl, Supervisory Industry Economist, Peter Gross, Supervisory Operations Research Analyst, and James Turnure, Director of Industrial Section for Transportation, Building, and Industrial Sections. Compl. ¶¶ 14, 60, 61; Ex. 1 at 2.

15.    Plaintiff participated in statutorily protected activity on October 12, 2017, by testifying in an EEO investigation in favor of a colleague against Perl. Compl. ¶ 4.

16.     Plaintiff was issued her performance plan for the performance year 2018, beginning October 1, 2017, and ending September 30, 2018 on or about November 29, 2017. *See* Exhibit 11, FY2018 Performance Plan, Nov. 29, 2017.

17.    Her performance plan included four Critical Elements, which the Code of Federal Regulations defines as "a work assignment or responsibility of such importance that unacceptable

performance on the element would result in a determination that an employee's overall performance is unacceptable." 5 C.F.R. § 432.103(b). The Critical Elements are: (1) Designs, develops, updates, and utilizes energy analysis tools (models, spreadsheets, databases, etc.); (2) Analyzes energy data, programs, and policies; (3) Writes articles, reports, and documentation; [and] (4) Provides information and analysis findings to internal and external stakeholders. Ex. 11.

18.    At a mid-year progress review on April 5, 2018, Perl noted Plaintiff was making progress learning the system but that she was "not working at her grade level in this area" for Critical Element 1 and cited two examples of Plaintiff not completing assignments as instructed. *Id.*

19.    For Critical Element 3, Perl stated that Plaintiff's 10-page paper is due May 31, 2018. *Id.*

20.    For Critical Element 4, Perl stated that Plaintiff is still "relatively new to EIA" and that she needs to remember that her supervisor is the most important stakeholder, and to ensure that "all tasks submitted to her supervisor are complete, correct and timely." *Id.*

21.    At a subsequent progress review on June 27, 2018, Perl stated Plaintiff submitted her 10-page paper required for Critical Element 3 with a solid list of references but that "most" of the material was not "properly attributed" and "not policy neutral", which is required by the EIA Style Guide. *Id.* Perl remarked that Plaintiff "will need to completely revise this paper, starting with an outline." *Id.*

22.    Plaintiff admitted there were "34 comments of adding more citations and references" to this draft. *Id.* at 13.

23.    Plaintiff was given three additional opportunities to revise her paper in order for it to be at the Meets Expectations Level, which was originally due on May 31, 2018. Her second submission was on August 24, 2018, the third on September 21, 2018, and her last submission was on January 2, 2019. *Id.*

24.    Her January 2, 2019 final draft was still deficient "despite extensive guidance," including several "paste-ins from other sources that were not correctly quoted as block quotes" and "sources" which "could not be confirmed." Exhibit 11 at 4; Compl. ¶ 39.

25.    Plaintiff filed a formal EEO complaint against Perl on December 14, 2018. *Id.* ¶ 35; *See* Exhibit 8 (DOE Case No. 19-0015-HQ-EI) (hereinafter referred to as "FAD 1"). The Agency issued a final decision on February 11, 2021 and dismissed all of Plaintiff's discrimination claims. FAD 1. Plaintiff appealed this decision to the EEOC Office of Federal Operations ("OFO") on March 11, 2021, the EEOC OFO affirmed the Agency's decision on August 8, 2022. *See* Exhibit 14, EEOC OFO Decision FAD 1, Aug. 8, 2022.

26.    It was determined that Plaintiff's annual performance rating for Critical Element 3 (i.e., writing articles, reports and documentation) was at the "Fails to Meet Expectations" level and she was placed on a Performance Improvement Plan ("PIP") on December 3, 2018 because her overall performance was deemed unacceptable. Compl. ¶¶ 31, 37; Ex. 2 at 8.

27.    This PIP was rescinded following Plaintiff's election to pursue the negotiated grievance procedures as she was a member of the National Treasury Employees Union ("NTEU" or the "Union"), which has a Collective Bargaining Agreement ("CBA") that permits allegations of discrimination and adverse actions to be raised. Compl. ¶¶ 33, 36-37.

28.    On January 16, 2019, Plaintiff received her 2018 performance evaluation of "Fails to Meet Expectation" for Critical Element 3. *Id.* ¶ 39.

29.    The Department reissued Plaintiff a PIP for Failing to Meet Expectations for Critical Element 3 on April 24, 2019. *See* Exhibit 13, PIP, Apr. 24, 2019.

30.    The PIP provided Plaintiff with ninety (90) calendar days to improve her performance and documented Plaintiff's deficiencies for Critical Element 3 in 2018 stating that during the period

between the second (June 28, 2018) and third performance reviews (September 20, 2018) Plaintiff "failed to submit a satisfactory ten-page paper on Irrigation in California as assigned[.]" *Id.* at 2.

31.     On September 18, 2019, Turnure gave Plaintiff a rating of Fails to Meet Expectations for two of four Critical Elements for her 2019 performance evaluation. *See* Exhibit 12, FY2019 Performance Plan. Compl. ¶ 69.

32.     On October 11, 2019, Plaintiff filed an EEO complaint citing issues with Gross, issues with her work assignments, and the asserted limitation on her career advancement opportunities. *See* Exhibit 9 (DOE Case No. 19-0114-HQ-EI) (hereinafter referred to as "FAD 2"); Ex. 1 at 3; Compl. ¶ 70. The Agency issued its final decision on April 22, 2021 and dismissed all claims of discrimination. Plaintiff appealed FAD 2 to the EEOC OFO on May 19, 2021. *See* ECF No. 1-1 at 17-18. The EEOC OFO affirmed the Agency's final decision finding no discrimination on August 8, 2022. *See* Exhibit 15, EEOC OFO Decision FAD 2, Aug. 8, 2022.

33.      Plaintiff was issued her performance plan for the performance year 2020, which included the same four Critical Elements as her prior performance plans. *See* Exhibit 5, FY2020 Performance Plan.

34.     Plaintiff was issued a Performance Counseling Memorandum dated January 27, 2020, which notified her that her performance in Critical Elements 1, 2, and 3 were deficient. *See* Exhibit 4, Performance Counseling Memorandum, Jan. 27, 2020; Ex. 1 at 2.

35.     Gross assigned Plaintiff three assignments for Critical Element 1; three assignments for Critical Element 2; and one assignment for Critical Element 3. Ex. 3. For Critical Element 1, Plaintiff turned in the first assignment almost a month late, the second assignment more than a month late, and the third assignment had yet to be turned in. *Id.* For Critical Element 2, Plaintiff turned in the first assignment was one week late, and the second and third had yet to be turned in.

*Id.* For Critical Element 3, the assignment had yet to be turned in and Plaintiff proposed her own research paper instead of the assignment. *Id.*

36.      On April 28, 2020, Plaintiff was placed on a Performance Demonstration Period ("PDP"), whereby she was notified that her performance for Critical Elements 1, 2, and 3 were likely to result in a rating of Fails to Meet Expectations, as well as an overall rating of Fails to Meet Expectations for the 2020 performance appraisal period if this did not improve over the next 30 days. *See* Exhibit 3, PDP Memorandum, Apr. 29, 2020; Compl. ¶ 73.

37.      The PDP provided Plaintiff with four assignments to complete during the PDP period, each Critical Element's requirements, Plaintiff's deficiencies in each Critical Element, and the actions required to improve performance to the Meets Expectations level. Ex. 3 at 1-7.

38.      Plaintiff's mid-year progress review was held in June 2020, where Plaintiff was informed that her performance was likely to result in an overall rating of Fails to Meet Expectations. Ex. 5; Compl. ¶ 77.

39.      On August 13, 2020, the Agency issued Plaintiff a Notice of Proposed Removal ("NOPR") because Plaintiff's performance did not improve during or at the conclusion of the PDP. *See* Exhibit 6, Notice of Proposed Removal, Aug. 13, 2020; *Id.* ¶ 78.

40.      The NOPR stated that the action was being proposed based on her "failure to demonstrate the ability to satisfactorily execute the essential duties and responsibilities of [her] position as required in the [PDP]." Ex. 6 at 1.

41.      The NOPR stated, "[t]his is a proposal only. No decision will be made until your reply has been received or until after the reply period has passed." *Id.* at 5.

42.    Lynn Westfall, Director, Office of Energy Markets & Financial Analysis, U.S. Energy Information Administration, concurred with the NOPR and issued her decision affirming Plaintiff's removal. Ex. 7.

43.    Westfall found the "standards and expectations set forth in [FY2020 Performance Plan (Exhibit 5), NOPR (Exhibit 6), and the PDP (Exhibit 3)] were clear" and thus concurred with the Agency's decision. Ex 7.

44.    Westfall also informed Plaintiff that her responses to the NOPR "[did] not provide any legitimate basis to mitigate the proposed action" because they were about "management's alleged improper procedures," "[her] associated past grievances," "leave and vacation time," and "[her] EEO Complaint against [Mr. Gross]." *Id.* at 3.

Dated:  December 5, 2022

Respectfully submitted,

MATTHEW M. GRAVES, D.C. Bar #481052
United States Attorney

BRIAN P. HUDAK
Chief, Civil Division

By: /s/_____
John Moustakas
Assistant United States Attorney
555 4th Street, N.W.
Washington, D.C. 20530
Telephone: 202-252-2518
Email:  john.moustakas@usdoj.gov

*Attorneys for the United States of America*

**Exhibit Index**

*Naz v. Granholm*, 2022-cv-001730-DLF

Exhibit 1        MSPB Decision dated: Sept. 3, 2021

Exhibit 2        EEOC Decision dated: May 23, 2022

Exhibit 3        PDP Memorandum dated: Apr. 28, 2020

Exhibit 4        Performance Counseling Memorandum dated: Jan. 27, 2020

Exhibit 5        FY 2020 Performance Plan and Appraisal Form 10/01/2019 – 09/30/2020

Exhibit 6        Notice of Proposed Removal  dated: Aug. 13, 2020

Exhibit 7        Removal Decision dated: Jan. 29, 2021

Exhibit 8        Final Agency Decision 1, DOE Case No. 19-0015-HQ-EI dated: Feb. 11, 2021

Exhibit 9        Final Agency Decision 2, DOE Case No. 19-0114-HQ-EI dated: April 22, 2021

Exhibit 10       Final Agency Decision 3, DOE Case No. 20-0106-HQ-EI dated: Jan. 24, 2022

Exhibit 11       FY 2018 Performance Plan and Appraisal Form 10/01/2017 – 09/30/2018;
                 Plaintiff Response

Exhibit 12       FY 2019 Performance Plan and Appraisal Form 10/01/2018 – 09/30/2019

Exhibit 13       April 24, 2019 PIP dated: April 24, 2019

Exhibit 14       EEOC OFO Decision FAD 1 dated: Aug. 8, 2022

Exhibit 15       EEOC OFO Decision FAD 2 dated: Aug. 8, 2022