UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

FARAH NAZ,

    *Plaintiff*,

v.

JENNIFER M. GRANHOLM,
Secretary of Energy,

    *Defendant.*

No. 22-cv-1730 (DLF)

**MEMORANDUM OPINION**

Plaintiff Farah Naz, proceeding *pro se*, brings this action under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*. Naz alleges that her former employer, the Secretary of Energy, discriminated against her on the bases of her race, sex, religion, and national origin by terminating her employment, failing to promote her, and retaliating against her. Compl., Dkt. 1. Before this Court is the secretary's Motion to Dismiss or, In the Alternative, For Summary Judgment. Def. Mot., Dkt. 16. For the following reasons, the Court will grant the motion to dismiss for failure to state a claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure.

**I. BACKGROUND**

Because this order resolves a motion to dismiss, the Court accepts the well-pleaded factual allegations in the complaint as true. *Arencibia v. 2401 Rest. Corp.*, 699 F.Supp.2d 318, 323 (D.C. Cir. 2010). Further, the Court construes them in the light most favorable to the plaintiff. *Id.* In deciding whether a complaint states a claim, "we may consider only the facts alleged in the complaint [and] any documents either attached to or incorporated in the complaint." *EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624 (D.C. Cir. 1997). Therefore, the Court draws

the facts of the instant action from the complaint, Dkt. 1, and Exhibits A and B attached to the complaint, both of which Naz incorporates by reference, *see* Dkt. 1-1; Compl. at 6. But the Court does not consider the later "Supplements to the Complaint," *see* Dkts. 6, 10, which are not incorporated by reference in the complaint. *Cf. Pappas v. District of Columbia*, 513 F. Supp. 3d 64, 80 n.5 (D.D.C. 2021) (rejecting the plaintiff's attempt to introduce new facts in later-filed briefs).

Farah Naz is a Muslim woman of Pakistani origin. Compl. at 5. *See* Dkt. 1; Ex. B ¶ 3, Dkt. 1-1. She has two graduate degrees, including a master's degree in financial economics for public policy from American University. *See* Ex. A ¶ 2, Dkt. 1-1. Naz worked in the federal government as an economist for over two decades in various roles at the Departments of Commerce and Energy. *Id.* ¶ 3.

On January 8, 2017, Naz took a position as an industrial economist with the Office of Energy Consumption and Efficiency Analysis at the Department of Energy. Ex. B ¶¶ 1–2, Dkt. 1-1. The office projects industrial-energy-consumption trends and publishes its analyses in Department of Energy publications. *See* Def. Mot. at 3, Dkt. 16. The first fifteen months of Naz's tenure in the office proceeded smoothly. She reported to Kelly Perl, another economist, with whom Naz enjoyed a "cordial and productive relationship." Ex. B ¶ 5, Dkt. 1-1. Naz also reported to a second-line supervisor, James Turnure, the director of her section. *Id.* ¶ 14; Def. Mot. at 3, Dkt. 16.

Additionally, Naz developed a "close relationship" with a colleague, Christopher Dickerson. Ex. B ¶ 6, Dkt. 1-1. In October 2017, Naz testified in favor of Dickerson in his race-discrimination complaint against Perl before the Equal Employment Opportunity office. *Id.* ¶ 4.

Specifically, Naz "spoke out against the rampant race discrimination that pervades the Agency." Ex. A ¶ 5, Dkt. 1-1.

In April 2018, Naz's work life underwent a "sea change." Ex. B ¶ 8, Dkt. 1-1. Perl's attitude toward Naz became "hostile, antagonistic, and unproductive." *Id.* Allegedly, Perl threatened to fire Naz on multiple occasions, bragged about firing other employees, and "screamed at and threatened to fire" Naz over a hotel reservation for a work conference. *Id.* ¶¶ 8–10, 12. Perl also "told [Naz] that 'non-native people' like [Naz] 'have difficulty' writing[] and asked [Naz] whether she had attended school in the United States." *Id.* ¶ 11.

As a result of these incidents, Naz spoke with Turnure and requested a transfer to a different supervisor in April 2018. *Id.* at ¶ 14. Naz set up meetings with other Department employees to discuss the possibility, but Perl "badmouth[ed]" Naz and instructed the employees to decline Naz's invitations. *Id.* ¶¶ 15–16. Naz did not transfer offices. Still under Perl's supervision several months later, she asked Perl to nominate her for an award. *Id.* ¶ 17. Perl declined. *Id.* ¶ 22. Perl also denied Naz's requests for Excel or leadership training, too. *See id.* ¶¶ 23–24.

In late 2018, Naz began to get negative feedback on her work product. In August, Perl deemed a paper written by Naz to be inadequate and directed her to rewrite the conclusion, to fix the bibliography form, and to add citations. *Id.* ¶ 26. In November, still dissatisfied with Naz's written work, Perl gave Naz a "Fails to Meet Expectations" rating during a performance review. *Id*. ¶ 28. Again, Naz complained to Turnure and requested a transfer. *Id.* ¶ 29.

In December 2018, Perl placed Naz on a 90-day "performance improvement plan" due to continued problems with the quality of her writing. *Id.* ¶¶ 31, 33. This status came with new restrictions, including limitations on Naz's participation in telework and alternative scheduling programs. *Id.* ¶ 34. In response, Naz filed an Equal Employment Opportunity complaint and a

3

complaint through the National Treasury Employees Union, the latter of which led to the suspension of the performance improvement plan. *Id.* ¶¶ 35–37; Def. Mot. at 6, Dkt. 16.

Still, Naz's work troubles persisted. In January, Perl gave Naz another low rating. Ex. B ¶ 39, Dkt. 1-1. And Perl denied more of Naz's requests for training, stating on one such occasion that Naz "could not comprehend the material." *See id.* ¶ 41. In March 2019, the Department transferred Naz out from under Perl's supervision, *see id.* ¶ 47, though the transfer did not improve Naz's performance. In April, Turnure placed Naz on another performance improvement plan. *Id.* ¶ 52.

Meanwhile, another supervisor, Peter Gross, began finding issues with Naz's work, too. In July, Gross told Naz her work product was "deficient and inadequate" and that her calculations were incorrect. *Id.* ¶¶ 62, 64. He also began to "bully" Naz, to "micromanage" her, to "misinform [her] about her projects," and to "tweak[] assignments . . . , sending different instructions every time [Naz] asked [him] for instructions." *Id.* ¶¶ 63–68. In October 2019, Naz filed an Equal Employment Opportunity complaint against Gross. *Id.* ¶ 70. Following that, in what Naz interprets as further evidence of discrimination and retaliation, Gross "deliberately kept meetings on [Naz's] busy working days" and "sent long emails to [Naz] so that she would become distracted from her work." *Id.* ¶¶ 74–75.

More sanctions followed. In September 2019, Turnure gave Naz a "Fails to Meet Expectations" rating during a performance review. *Id.* ¶ 69. In January 2020, Gross denied Naz an automatic salary-grade increase from GS-12, Step 8, to GS-12, Step 10. *Id.* ¶ 71. In April 2020, Naz was placed on a "performance demonstration period plan." *Id.* ¶ 73. In June, Naz learned that she would get another "Fails to Meet Expectations" rating. *Id.* ¶ 77. In August, the Department issued her a Notice of Proposed Removal for "failure to successfully complete" the

performance demonstration period plan. *Id.* ¶ 78. In November 2020, she was transferred to another section in the Department. Compl. at 5, Dkt. 1.

Ultimately, the Department terminated Naz's employment on January 29, 2021. *Id.*; Ex. B ¶ 81, Dkt. 1-1. She sought review of her termination with the federal government's Merit Systems Protection Board, which decided that she failed to establish that discrimination led to her termination. Ex. B at 10. The Board "concluded that there was no nexus between [her] prior [Equal Employment Opportunity] complaints and her removal" and "disagreed . . . that her supervisor created a [toxic] work environment." *Id.* at 11. Later in 2021, Naz appealed the Board's conclusion with the Equal Employment Opportunity Commission, and the Commission affirmed the Board. *Id.* at 10–14. It issued Naz a Notice of Right to Sue letter in May 2022. *Id.* at 13.

Naz filed the instant action *pro se* in the federal district court. She alleges that the Department discriminated against her on the bases of her race, sex, religion, and national origin in violation of Title VII of the Civil Rights Act of 1964. *See* 42 U.S.C. § 2000e *et seq.*; Compl. at 4–5, Dkt. 1. Specifically, she complains about the termination of her employment, the failure to promote her, retaliation, and reprisal. *Id.* at 5. She seeks reinstatement, reassignment, lost wages and benefits, and $300,000 in compensatory damages, among other relief. *Id.* at 6. In response, the government filed a motion to dismiss or, in the alternative, for summary judgment. Def. Mot., Dkt. 16.

## II. LEGAL STANDARD

A defendant may move to dismiss a complaint for failure to state a claim upon which relief can be granted. *See* Fed. R. Civ. P. 12(b)(6). To survive a Rule 12(b)(6) motion, the complaint must contain factual matter sufficient to "state a claim to relief that is plausible on its face," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007), such that the Court can "draw the reasonable

5

inference that the defendant is liable for the misconduct alleged," *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). This standard does not amount to a specific probability requirement, but it does require "more than a sheer possibility that a defendant has acted unlawfully." *Id.*; *see also Twombly*, 550 U.S. at 555 ("Factual allegations must be enough to raise a right to relief above the speculative level."). As such, the allegation of facts that are "merely consistent with a defendant's liability . . . stops short of the line between possibility and plausibility." *Iqbal*, 556 U.S. at 678 (internal quotation marks omitted).

Well-pleaded factual allegations are "entitled to [an] assumption of truth." *Id.* at 679. But the Court does not apply that assumption to "legal conclusion[s] couched as . . . factual allegation[s]." *Id.* at 678 (internal quotation marks omitted). Thus, it will not credit an "unadorned, the-defendant-unlawfully-harmed-me accusation;" likewise, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, [will] not suffice." *Id.* Ultimately, "[d]etermining whether a complaint states a plausible claim for relief [is] . . . a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679.

### III. ANALYSIS

The complaint alleges three claims under Title VII for discrimination in the termination of Naz's employment, discrimination in the failure to promote her, and retaliation. For the reasons that follow, the complaint fails to state any of these claims. Thus, the Court will dismiss the complaint.

### A. Termination of Employment

First, Naz alleges that the Department discriminated against her based on her race (Middle Eastern), her sex (female), her religion (Islam), and her national origin (Pakistan) by terminating her employment. *See* Compl. at 5, Dkt. 1.

The sparse facts of the complaint do not suffice to show this discrimination. To state a claim for Title VII discrimination, a complaint must allege facts that, if true, would establish the three elements of a prima facie case for discrimination: "(1) [the claimant] is a member of a protected class; (2) she suffered an adverse employment action; and (3) the unfavorable action gives rise to an inference of discrimination." *Wiley v. Glassman*, 511 F.3d 151, 155 (D.C. Cir. 2007); *see McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1972). The first and second elements are indisputably satisfied, *see* Def. Mot. at 25, Dkt. 16, but the Court finds no facts in the complaint from which an inference of discrimination could be drawn to satisfy the third element. For instance, a plaintiff may plausibly plead this element by alleging that similarly situated employees who are not part of the protected class were treated differently, *Sharpe v. Bair*, 580 F. Supp. 2d 123, 133 (D.D.C. 2008), but the complaint attempts no such showing. A plaintiff may also meet this element by showing that the termination could not be attributable to poor performance. *See id.* But the complaint repeatedly alleges that Naz's supervisors were dissatisfied with her job performance. *See generally* Ex. B, Dkt. 1-1. And although a plaintiff may introduce any "other form[] of indirect evidence that gives rise to the inference," *Sharpe*, 580 F. Supp. 2d at 133, the complaint does not allege that her supervisors considered her protected characteristics during the termination process in any way. Simply put, the complaint gives rise to no plausible inference that discrimination led to Naz's firing.

There are only two facts that touch upon Naz's protected characteristics, neither of which suggests a discriminatory termination. First, the complaint alleges that Perl told Naz in April 2018 that "'non-native people' like [Naz] 'have difficulty' writing." Ex. B ¶ 11, Dkt. 1–1. But at the time of her termination, Naz had transferred away from Perl and had been working under a different supervisor, Gross, for nearly two years. *See id.* ¶ 47. The "stray remarks of nondecisionmakers are not sufficient, standing alone, to raise an inference of discrimination," *Markowicz v. Johnson*, 206 F. Supp. 3d 158, 176 (D.D.C. 2016) (cleaned up), and the complaint does not allege that Perl was a decisionmaker in Naz's termination. Meanwhile, the apparent decisionmakers, Gross and Turnure, had ample justification to fire Naz based on her record of poor performance over time. *See, e.g.*, *id.* ¶ 77. Second, the complaint alleges that Naz told Turnure that "she thought" he had revoked her alternative scheduling privileges "because she [was] a minority woman." *Id.* ¶ 59. But this fact, even if true, proves merely that *Naz believed* she was the victim of discrimination, not that she was. *See* Def. Mot. at 23, Dkt. 16. Without more, the complaint offers only conclusory allegations that this Court cannot credit under the *Twombly* pleading standard. *See* 550 U.S. at 557. The claim must be dismissed.

### B. Failure to Promote

Second, Naz alleges that the Department discriminated against her by failing to promote her. *See* Compl. at 5, Dkt. 1. Although the complaint does not explain when this failure to promote occurred, the Court infers that it occurred when Gross denied Naz's salary increase to GS-12, Step 10, in January 2020. *Cf. Figueroa v. Pompeo*, 435 F. Supp. 3d 160, 167 (D.D.C. 2020) (counting non-promotion up a federal pay schedule as an adverse action for Title VII failure-to-promote purposes).

The complaint again fails to state a discrimination claim. In failure-to-promote cases that involve denials of increases in pay or grade, a plaintiff proves her prima facie case by showing that "she sought and was denied a promotion for which she was qualified[] and that other employees of similar qualifications . . . were indeed promoted at the time the plaintiff's request for promotion was denied." *Taylor v. Small*, 350 F.3d 1286, 1294 (D.C. Cir. 2003) (internal quotation marks omitted). The complaint alleges none of this. It alleges that the step increase should have been "automatic," but it does not mention any other employee who received that automatic promotion. Ex. B. ¶ 71, Dkt. 1–1. Accordingly, the complaint fails to state the claim.

Because the Court affords complaints penned by *pro se* plaintiffs a liberal construction, *see Anderson v. Reilly*, 691 F. Supp. 2d 89, 92 (D.D.C. 2010), it will also address the argument that Naz's placement on several performance-related plans disqualified her from promotions to which she otherwise would have applied, though this argument is not explicit in the complaint but is instead contemplated by Naz's response to the motion to dismiss, Pl. Mot. at 65, Dkt. 23. The framework for failure-to-promote claims of this sort "demands that the alleged discriminatee demonstrate at least that [her] [non-promotion] did not result from the two most common legitimate reasons on which an employer might rely . . . : an absolute or relative lack of qualifications or the absence of a vacancy in the job sought." *Morgan v. Fed. Home Loan Mortg. Corp.*, 328 F.3d 647, 650–51 (D.C. Cir. 2003) (alterations adopted) (internal quotation marks omitted). But "legitimate reasons" for Naz's placement on the performance plans and other job-related sanctions abounded. For example, by the time of Naz's performance demonstration period plan, Naz was coming up on (at least) her fourth "Fails to Meet Expectations" rating. Ex. B ¶¶ 52, 69, Dkt. 1-1. No matter how the Court reads it, the complaint fails to state a failure-to-promote discrimination claim. The Court will dismiss the claim.

### C.     Retaliation/Reprisal

Finally, Naz alleges that the Department engaged in retaliation and reprisal in violation of Title VII, after she testified in support of her colleague's Equal Employment Opportunity racial discrimination complaint and after she filed her own Equal Employment Opportunity complaints. *See* Compl. at 5, Dkt. 1.  If the complaint is read liberally, Naz's termination, the Department's denials of additional training, the denials of Naz's participation in the alternative work schedule and telework programs, and Gross's management style all constituted alleged retaliation.  *See id.*

The standard that governs retaliation claims echoes that of discrimination claims.  Title VII's anti-retaliation provision prohibits an employer from discriminating against an employee that (1) "has opposed any practice made an unlawful employment practice by [Title VII]"; or (2) "has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]." 42 U.S.C. § 2000e-3(a).  To state a retaliation claim, an employee must establish a prima facie case by showing "(1) that [the] employee engaged in statutorily protected activity; (2) that the employee suffered a materially adverse action by the employee's employer; and (3) that a causal link connects the two." *Howard R.L. Cook & Tommy Shaw Found. for Black Emps. of Libr. of Cong., Inc. v. Billington*, 737 F.3d 767, 772 (D.C. Cir. 2013). Regarding the third element, "Title VII retaliation claims require proof that the desire to retaliate was the but-for cause of the challenged employment action." *Univ. of Tex. Sw. Med. Ctr. v. Nassar,* 570 U.S. 338, 352 (2013).

Again Naz has failed to allege facts to support the third element of a Title VII claim: the presence of a causal link.  "Because causation can be difficult to prove, a plaintiff may raise a presumption of causation by showing that the employer had knowledge of the protected activity and that the adverse action occurred soon thereafter." *Vance v. Chao*, 496 F. Supp. 2d 182, 186

10

(D.D.C. 2007); *accord Rochon v. Gonzales*, 438 F.3d 1211, 1220 (D.C. Cir. 2006). But "a plaintiff wishing to rely on this presumption must allege that the protected activity and the adverse action occurred very close in time," *Vance*, 496 F. Supp. 2d at 186, which this Court has interpreted repeatedly to mean that no more than three months can elapse between the two points. *See Williams v. Spencer*, 883 F. Supp. 2d. 165, 178 (D.D.C. 2012) (collecting cases); *Rattigan v. Gonzales*, 503 F. Supp. 2d 56, 77 (D.D.C. 2007) (same).

The amount of time in the instant action is too long. *See* Def. Mot. at 28, Dkt. 16. Nearly three years lapsed between the time Naz testified for Dickerson and her termination. *See* Ex. B ¶¶ 4, 81. Roughly two years passed from the time of her own first complaint; over a year passed from the time of her second complaint. *See id.* ¶¶ 35, 70, 81; Def. Mot. at 27. And six months passed from Naz's testimony to the earliest inklings of a toxic work environment. *See* Ex. B. ¶¶ 4, 10, Dkt. 1-1. By the time Naz filed her own Equal Employment Opportunity complaints, she had already begun receiving negative feedback on her work, and those complaints persisted even after she filed her complaints. To the extent Naz implicitly relies on timespan to establish a causal link, the link is too temporally attenuated.

Of course, a plaintiff may put forward evidence other than temporal proximity to show causality, *Vance*, 496 F. Supp. 2d at 186, but Naz has not done so. Far from establishing but-for causation, the complaint contains *no* facts that suggest the Department had a retaliatory motive. The complaint does not even satisfactorily allege that Naz's supervisors "had knowledge of the protected activity" at the time the alleged reprisal began. *Id.* "[U]pon information and belief and based on the sea change in Dr. Perl's attitude toward [Naz]," Naz assumed that Perl learned of her October 2017 testimony in April 2018, but the complaint offers no facts that show that Perl or any other supervisor had actual knowledge that she had testified. Ex. B ¶ 8. Even with some effort,

the Court is unable to discern any direct evidence of retaliation from the complaint's allegations. Moreover, if the Court accepts all the allegations as true, the complaint tells a familiar story of disciplinary sanctions following repeated instances of substandard work.  For instance, Naz received her first "Fails to Meet Expectations" rating after submitting a poorly received paper to her supervisor, and she was denied opportunities like telework and alternative scheduling only after being placed on a performance improvement plan following that rating and other negative reviews.  *See, e.g.*, Ex. B ¶¶ 28, 33–34, 57, 69, at 6, Dkt. 1-1.  Naz's proffered facts bolster, rather than refute, the inference that the cause of her termination and other setbacks was her professional deficiencies, not the Department's retaliatory animus.  Her retaliation claim must be dismissed.

## IV. CONCLUSION

For the above stated reasons, the Court grants the defendant's Motion to Dismiss or, In the Alternative, for Summary Judgment and denies the defendant's motion for summary judgment as moot.

September 30, 2023

_____
DABNEY L. FRIEDRICH
United States District Judge